1
2
3
4
5
6
7
8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   PHILLIP ANTHONY PETERSON,

11              Petitioner,                No. CIV S-02-1720 FCD DAD P

12        vs.

13   ERNEST ROE, Warden, et al.,

14              Respondents.              FINDINGS & RECOMMENDATIONS

15   _____/

16              Petitioner is a state prisoner proceeding pro se with an application for a writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1998 conviction on

18   charges of second degree murder and assault with a firearm, with enhancements for having

19   personally used a firearm in the commission of each offense.  He seeks relief on the grounds that:

20   (1) his conviction for second degree murder was not supported by sufficient evidence; (2) his

21   right to due process was violated by jury instruction error; (3) his trial and appellate counsel

22   rendered ineffective assistance; (4) the trial court erred in denying his motion for change of

23   venue; (5) the trial court erred in failing to hold a Marsden hearing; (6) the trial judge erred in

24   vouching for the credibility of a prosecution witness and in discrediting a defense witness; (7) his

25   constitutional rights were violated by omissions in the state court record; (8) he is factually

26   innocent; and (9) his trial proceedings were rendered fundamentally unfair because the trial judge

1

1   and one of his defense attorneys had a conflict of interest.  Upon careful consideration of the

2   record and the applicable law, the undersigned will recommend that petitioner's application for

3   habeas corpus relief be denied.

4                          PROCEDURAL AND FACTUAL BACKGROUND

5       Defendant lived in a trailer behind his parent's [sic] house.  Also
        residing on the premises was defendant's brother, John Peterson,
6       who lived in a separate mobile home.

7       At approximately 4:30 or 5:00 p.m. on April 1, 1997, defendant
        came to his parent's [sic] house for dinner.  He "dished his plate
8       up" with food and returned to his trailer to eat.  Later, defendant
        came back for seconds.  He did not seem upset.  John Peterson was
9       away from the premises at the time.  Defendant's mother, Barbara
        Peterson, noticed John's dog was loose and went to find John.  She
10      and John returned to the premises shortly thereafter.

11      After John retrieved the dog, he and his parents stood outside the
        house.  They heard noises coming from defendant's trailer which
12      sounded like "banging around and slamming" and "crashing."
        Barbara banged on the awning of the trailer and defendant asked
13      "'What do you want?'" and inquired whether she had money.
        Barbara answered "[y]es" and asked what was the problem.
14      Defendant hit the trailer window and told her to "get the '[f]' out of
        there."  This was followed by more "ranting and raving" from
15      inside.

16      John moved to another location in the yard to chain his dog.  While
        bending over to do so, John heard the door of the trailer "slam
17      open" and looked up in time to see "somebody with blonde hair"
        shoot at him with a handgun.  The shot hit John on the right leg
18      five or six inches above the knee.  Barbara helped John into the
        house and, at 5:54 p.m., called 911.  While Barbara waited on the
19      line for police to arrive, defendant's father transported John to the
        hospital.

20
        Officers Timothy Werner and Brian Meilbeck arrived on the scene
21      at 6:01 p.m. wearing police uniforms.  They drove a patrol car but
        did not activate the siren or flashing lights.  It was a bright sunny
22      day but, by this time, the sun was going down.  The officers could
        not see anyone around and took a position of cover behind a pickup
23      truck parked in the driveway.  There they remained for a minute or
        so until Sergeant Jim Downs arrived.  Downs was also driving a
24      patrol car, but he utilized the flashing lights and siren.

25      Downs joined Werner and Meilbeck behind the pickup.  Meilbeck
        alerted the others that he heard something coming from the trailer.
26      While the officers were talking, defendant's mother opened the

                                          2

front door of the house and began yelling at them.  Downs pointed a gun at her and she said something to the effect, "'it's not me,'" "'[in] the trailer.'"

Downs shouted in the direction of the trailer and mobile home: "This is the sheriff's office.  You inside come out now.  Come out now."  One of the other officers knocked on the motor home but got no response.  The officers then proceeded toward the front of the pickup truck.  Meilbeck began moving across the driveway toward another vehicle.  Downs told him to take cover, but his warning came too late.  Almost immediately, the officers heard the sound of a gunshot and a window breaking.  Meilbeck clutched himself and fell to the ground.  He had been hit by a shotgun blast and received a number of puncture wounds in the shoulder, neck, thigh and side.  Downs and Werner retreated and Downs asked Meilbeck if he was alright.  Meilbeck said, "No," but got up and ran around the side of the house and out of sight.

At 6:04 p.m., Downs notified dispatch of an "11-99, [o]fficer down" situation.  Other officers arrived on the scene and took up positions around the trailer.  Medical personnel arrived and located Meilbeck in the front yard of the house.  At approximately 6:25 p.m., defendant emerged from the trailer and was arrested.  Inside the trailer, the officers found a handgun, two shotguns and a rifle.  There was a hole in one of the windows of the trailer as well as in a framed painting on a copper sheet that had been leaning against the window.

Officer Meilbeck died as a result of the wounds received at the scene.

Defendant was charged with first degree murder of a peace officer (Pen. Code, § 187, 190.2, subd. (a) (7)) and assault with a firearm (Pen. Code, § 245, subd. (a) (2)).  He was also charged with having personally used a firearm in connection with each offense.  (Pen. Code, § 12022.5, subd. (a) (1).)  The defense presented evidence, primarily through the testimony of Dr. John Wicks, a clinical neuropsychologist, regarding defendant's impaired intellectual and emotional functioning.  Wicks described defendant as being "mildly mentally retarded," with an IQ of 75.  Wicks also diagnosed defendant as having a "personality disorder" caused by a brain abnormality which can lead to high stress and aggressive behavior.

The jury found defendant not guilty of first degree murder.  However, as indicated previously, he was found guilty of second degree murder and assault with a firearm.  The weapon use enhancements were found true.

/////

3

(Answer, Ex. D (Opinion), at 2-5.)  On December 14, 1998, petitioner was sentenced to an aggregate term in state prison of forty-three years to life.  (Clerk's Transcript on Appeal (CT) at 696-97.)

On December 15, 1998, petitioner filed a timely notice of appeal.  (Id. at 698.) Therein, he claimed that: (1) there was insufficient evidence to support his murder conviction; and (2) the trial court erroneously rejected his proposed modification to a jury instruction regarding the use of evidence of his mental impairment.  (Answer, Exs. C, D.)  The California Court of Appeal for the Third Appellate District affirmed petitioner's judgment of conviction in its entirety in an unpublished decision dated March 29, 2000.  (Answer, Ex. D.)

On May 3, 2000, petitioner filed a petition for review in the California Supreme Court.  (Answer, Ex. E.)  Therein, he argued that the court should grant review to determine the proper application of the substantial evidence rule in determining the sufficiency of the evidence to support a conviction.  (Id.)  That petition was summarily denied on July 14, 2000.  (Answer, Ex. F.)

On approximately February 17, 2001, petitioner filed a petition for writ of habeas corpus in the Yuba County Superior Court.  (Answer, Ex. G.)  Therein, he raised all of the claims raised in the instant petition, with the exception of his sufficiency of the evidence claim.  That petition was denied by order dated March 13, 2001, with the court stating as follows:

> The Court has read and considered Defendant's Petition for Writ of Habeas Corpus.  The issues raised by the petitioner were dealt with on appeal and the judgment and sentence of the Court was affirmed.  Habeas corpus ordinarily cannot serve as a second appeal or as a substitute for an appeal.  In re Terry (1971) 4 Cal.3d 911, 927; In re Bower (1985) 38 Cal.3d 865, 872; People v. Miller (1992) 6 Cal.App.4th 873, 881; In re Clark (1993) 5 Cal.4th 750, cf. this Court's Ruling filed February 9, 2001.  As to claims of ineffective assistance of counsel on appeal, the Petition fails to allege a prima facie case for relief.  In re Alvernanz (1992) 2 Cal.4th 924; People v. Williams (1988) 44 Cal.3d 883, 936.  The application for relief is therefore denied.

(Answer, Ex. H.)

1    On March 28, 2001, petitioner filed a motion for the recusal of Yuba County

2   Superior Court Judge James Curry and a motion for reconsideration of his petition for writ of

3   habeas corpus, arguing that the Superior Court had failed to address the claims contained in his

4   habeas petition.  (Answer, Ex. I.)  Both motions were summarily denied by the Yuba County

5   Superior Court in an order dated May 10, 2001.  (Answer, Ex. J.)

6    On May 14, 2001, petitioner filed a petition for writ of habeas corpus in the

7   California Court of Appeal for the Third Appellate District.  (Answer, Ex. K.)  That petition was

8   summarily denied by order dated June 14, 2001.  (Answer, Ex. L.)  On July 16, 2001, petitioner

9   filed a petition for writ of habeas corpus in the California Supreme Court.  (Answer, Ex. M.)

10   That petition was summarily denied by order dated August 1, 2002.  (Answer, Ex. N.)[1]  Petitioner

11   filed the instant petition for writ of habeas corpus on August 14, 2002.

12                                              ANALYSIS

13   I.  Standards of Review Applicable to Petitioner's Claims

14    A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of

15   some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860,

16   861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v.

17   Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the

18   interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991);

19   Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.

20    However, a "claim of error based upon a right not specifically guaranteed by the

21   Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

22   infects the entire trial that the resulting conviction violates the defendant's right to due process."

23

24        [1]  The documents contained in Exhibit K and M to respondents' Answer appear to be
     incomplete.  However, it appears from the record, and this court will assume, that petitioner
25   raised the same claims in his petitions for writ of habeas corpus to the California Court of Appeal
     and the California Supreme Court that he raised in his petition for writ of habeas corpus filed in
26   the Yuba County Superior Court.

1   Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

2   Cir. 1980)).  See also Lisenba v. California, 314 U.S. 219, 236 (1941); Henry v. Kernan, 197

3   F.3d 1021, 1031 (9th Cir. 1999).  In order to raise such a claim in a federal habeas corpus

4   petition, the "error alleged must have resulted in a complete miscarriage of justice."  Hill v.

5   United States, 368 U.S. 424, 428 (1962).  See also Henry, 197 F.3d at 1031; Crisafi v. Oliver,

6   396 F.2d 293, 294-95 (9th Cir. 1968).  Habeas corpus cannot be utilized to try state issues de

7   novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

8          Because this action was filed after April 26, 1996, the provisions of the

9   Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are applicable.  See Lindh v.

10  Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003).

11  Section 2254(d) as amended by the AEDPA, sets forth the following standards for granting

12  habeas corpus relief:

13          An application for a writ of habeas corpus on behalf of a
        person in custody pursuant to the judgment of a State court shall
14      not be granted with respect to any claim that was adjudicated on
        the merits in State court proceedings unless the adjudication of the
15      claim -

16          (1) resulted in a decision that was contrary to, or involved
        an unreasonable application of, clearly established Federal law, as
17      determined by the Supreme Court of the United States; or

18          (2) resulted in a decision that was based on an unreasonable
        determination of the facts in light of the evidence presented in the
19      State court proceeding.

20  28 U.S.C. § 2254(d).  See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.

21  Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

22          As explained above, petitioner raised all of the claims contained in the pending

23  petition, except his claim challenging the sufficiency of the evidence, in a petition for writ of

24  habeas corpus filed in the Yuba County Superior Court.  The Superior Court addressed the merits

25  only of petitioner's claim of ineffective assistance of appellate counsel, denying relief as to the

26  remainder of the claims on procedural grounds.  (Answer, Ex. H.)  Petitioner subsequently raised

1   these same claims again in petitions for a writ of habeas corpus filed in the California Court of

2   Appeal and California Supreme Court.  (Answer, Exs. K, M.)  The California Court of Appeal

3   and California Supreme Court summarily denied petitioner's claims.  The order issued by each of

4   these courts is "an unexplained order," i.e., "an order whose text or accompanying opinion does

5   not disclose the reason for the judgment."  Ylst v. Nunnemaker, 501 U.S. 797, 802 (1991).

6   When confronted with a state court's unexplained order, the federal court applies the following

7   presumption:  "Where there has been one reasoned state judgment rejecting a federal claim, later

8   unexplained orders upholding that judgment or rejecting the same claim rest upon the same

9   ground."  Id. at 803.  See also Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  In applying

10  the look-through presumption, unexplained orders are given no effect.  Id. at 804.

11          Here, there was a reasoned state judgment issued by the Yuba County Superior

12  Court.  This court will look through the unexplained orders of the California Supreme Court and

13  the California Court of Appeal to the decision of the Superior Court in order to determine

14  whether the state courts' adjudication of petitioner's federal claims satisfies the standards set

15  forth in § 2254.  However, respondents do not argue that any of petitioner's claim are

16  procedurally barred, instead asserting that relief as to each of petitioner's claims should be denied

17  on the merits.  Respondents have therefore waived any defense based upon a procedural bar.  See

18  Bennett v. Mueller, 322 F.3d 573, 584-86 (9th Cir. 2003).  Because the Superior Court denied

19  relief on a number of petitioner's claims solely on procedural grounds, there is no state court

20  decision addressing the merits of these claims.  When it is clear that a state court has not reached

21  the merits of a petitioner's claim, the AEDPA's deferential standard does not apply and a federal

22  habeas court must review the claim de novo.  Menendez v. Terhune, 422 F.3d 1012, 1025 (9th

23  Cir. 2005); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).[2]  Accordingly, this court will

24

25          [2] Under AEDPA, factual determinations by the state court are presumed correct and can
    be rebutted only by clear and convincing evidence.  Pirtle v. Morgan, 313 F.3d 1160, 1168 (9th
26  Cir. 2002).

1  subject petitioner's claims to de novo review, except for his claim of ineffective assistance of

2  appellate counsel which was presented in the petition for writ of habeas corpus filed with the

3  Yuba County Superior Court (see Answer, Ex. G).

4  The Superior Court denied petitioner's claim of ineffective assistance of appellate

5  counsel solely on the basis that petitioner had failed "to allege a prima facie case for relief."

6  (Answer, Ex. H.)  While this is a decision on the merits, there was no discussion of petitioner's

7  ineffective assistance of appellate counsel claim or the court's reasoning in rejecting it.  This

8  court is therefore "presented with a state court decision that is unaccompanied by any ratio

9  decidendi" with respect to the ineffective assistance of appellate counsel claim and an

10  independent review of the record is required "to determine whether the state court clearly erred in

11  its application of controlling federal law."  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

12  See also Allen v. Ornoski, 435 F.3d 946, 955 ((9th Cir. 2006); Pirtle v. Morgan, 313 F.3d 1160,

13  1167 (9th Cir. 2002) ("Federal habeas review is not de novo when the state court does not supply

14  reasoning for its decision, but an independent review of the record is required to determine

15  whether the state court clearly erred in its application of controlling federal law."); Wilcox v.

16  McGee, 241 F.3d 1242, 1245 (9th Cir. 2001).

17  Finally, petitioner's first claim challenging the sufficiency of the evidence to

18  support his conviction of murder was raised on direct appeal and rejected on the merits in a

19  reasoned opinion by the California Court of Appeal.  (Answer, Ex. D.)  The California Supreme

20  Court summarily denied the petition for review, thereby adopting the reasoning of the California

21  Court of Appeal.  (Answer, Ex. F.)  Accordingly, this court will look through the unexplained

22  order of the California Supreme Court to the decision of the California Court of Appeal in order

23  to determine whether the state courts' adjudication of petitioner's insufficiency of the evidence

24  claim satisfies the standards set forth in § 2254.  Ylst, 501 U.S. at 803; Avila, 297 F.3d at 918.

25  /////

26  /////

8

II.  Petitioner's Claims

    A.  Sufficiency of the Evidence (Claim 1)

        Petitioner's first claim is that the evidence was insufficient to support his conviction for second degree murder because there was no evidence that he harbored express or implied malice.  In support of this claim, petitioner directs the court's attention to trial testimony indicating he might not have been able to see out the window at the time he fired the fatal shot; that the shotgun used in the shooting did not have a stock, therefore making it more difficult to "chamber the round;" and testimony regarding his developmental disorder and emotional problems.  (Pet. at 7 (ground one).  See also Reporter's Transcript on Appeal (RT), Vol. III (Trial) at 527, 535-38; RT Vol. IV(Trial) at 729.)[3]  Petitioner also directs the court to the following question asked by the jury during its deliberations:

> If we agree that he should have known that the victim was a peace
> officer, but we find that the defendant did not know how do we fill
> the form?
>
> Others find that the defendant did know or reasonably should have
> known that . . .
>
> Please help . . . Form vague.

(CT at 622.)  On direct appeal in state court, petitioner argued that his offense of conviction should be reduced to involuntary manslaughter because there was evidence from which the jury could have concluded he acted only with criminal negligence.  (Opinion at 5.)

/////

---

[3]  Respondents have filed two sets of Reporter's Transcripts on Appeal: one containing the transcript of the trial proceedings, and the other containing the transcript of pretrial proceedings.  The first three transcripts of each set are designated in the identical manner: "Court Reporters' Transcript on Appeal Volume I;" "Court Reporters' Transcript on Appeal Volume II;" and "Court Reporters' Transcript on Appeal Volume III."  For purposes of clarity, when referring to the Reporter's Transcript this court will designate whether the transcript refers to the trial or to pretrial proceedings.  The court also notes that the Volume III of the trial proceedings lodged with this court is missing pages 598-613.  However, the omitted pages are not necessary to a resolution of the pending petition.

The California Court of Appeal rejected petitioner's insufficiency of the evidence argument, concluding that the evidence presented at trial was sufficient for a jury to find that petitioner had acted with both express and implied malice.   The appellate court explained its reasoning as follows:

> Despite defendant's assertions to the contrary, there is evidence in the record to support a conclusion defendant aimed the shotgun at the victim before firing.  After defendant was arrested, officers examined the window in the trailer through which the fatal shot was fired.  They found a framed metallic picture with a hole in it and a curtain in two halves on the window with soot and two holes ripped through it.  Stephen Bentley, a criminalist with the California Department of Justice, testified regarding the probable configuration of the window, picture and curtain at the time of the shot.  He indicated these items were in close proximity, with the shot going through the corner of the curtain then through the picture and finally through the window.  Bentley ran a string through the hole in the window over to a water shed on which a pattern of shotgun pellets was discovered.  By this means, Bentley was able to determine the approximate location of Officer Meilbeck when he was shot.  He testified Meilbeck was standing approximately 20 feet from the trailer.  Bentley was asked if a person inside the trailer could have seen out when the shot was fired.  He answered: "There is a possibility that or there is an opening in the window that exists to where you could look out while firing a shot with a 20-gauge shotgun."
>
> Defendant agues that, because the shotgun used to kill Meilbeck was without a stock, "this would make it difficult to aim." However, there is no evidence of this in the record.  No witness testified the absence of a stock made the weapon difficult to aim. Defendant further argues Bentley "acknowledged a possible trajectory in which defendant would not have been able to see out the window."  However, because we consider the evidence in the light most favorable to the judgment, we accept Bentley's testimony that there was a configuration of shooter position and shot trajectory which permitted the shooter to see out the window. This, plus the simple fact defendant fired one shot and hit the only officer who had emerged from cover, is sufficient to support a finding of express malice.
>
> Regarding implied malice, defendant argues there is insufficient evidence he appreciated the danger to human life at the time he discharged the shotgun.  Defendant relies on the testimony of Dr. Wicks, which he contends is undisputed, and the observations of deputy Wencel Kemp, who testified defendant appeared dazed and without focus when he emerged from the trailer after the shooting.

Defendant's reliance on the foregoing evidence is misplaced. First, although deputy Kemp testified defendant appeared "dazed" and "didn't appear anywhere near rational" when he came out of the trailer, Kemp also testified he commanded defendant to walk toward him and defendant did so. Kemp further testified: "He hesitated and I continued to give the command to walk toward me. He said, 'I'm worried' or he said, '[y]ou'll kill me.' And I go, 'I won't shoot you. Walk towards me.'" When defendant got within four to six yards of the officer, he started to trot toward the house and Kemp tackled him.

Far from demonstrating defendant's unawareness of the danger of his discharge of the firearm, this testimony shows defendant knew the firing of such a weapon could result in death, in this case his own. Defendant feared the officer, who was armed with two firearms at the time, would kill him. It is reasonable to infer that, if defendant understood he could be killed by the discharge of Kemp's firearms, defendant appreciated that the discharge of his own firearm could result in the death of another.

As to the expert testimony, defendant argues Dr. Wicks testified defendant is mildly retarded and has a severe developmental disorder. Wicks testified regarding defendant's past, including having to repeat kindergarten and being expelled from school for "unruly behavior." Defendant was put on Ritalin for a time and was in counseling. At age 17, defendant had a "psychotic episode" and was admitted to a psychiatric hospital. Dr. Wicks testified defendant has difficulty sorting out information and retaining it. He further testified tests showed damage to the left temporal lobe of defendant's brain which can lead to aggressive behavior. Dr. Wicks diagnosed defendant as having a "pervasive developmental disorder," meaning he "does not develop intellectually, socially, educationally, and eventually vocationally in a normal way." The foregoing testimony, although demonstrating defendant's mental impairment and arrested mental development, does not negate his ability to understand the dangers of discharging a shotgun out of a trailer window at a time when defendant knew others were around. Defendant was aware his parents and brother had been outside just prior to the shooting. He was also aware police officers were there, in light of Downs's use of the siren and flashing lights on his patrol car and announcement that sheriff's deputies were present. Thus, even if defendant did not actually see the officers, it is reasonable to assume he knew they were there. While defendant's clearly aggressive behavior may have been caused, at least in part, by his mental impairment, such impairment does not excuse the conduct. The record supports a finding that defendant understood the danger to others from his discharge of the

/////

/////

1    shotgun and proceeded in total disregard of it.  There is sufficient
     evidence to support the second degree murder conviction.
2

3    Opinion at 6-10.)[4]

4           There is sufficient evidence to support a conviction if, "after viewing the evidence

5    in the light most favorable to the prosecution, any rational trier of fact could have found the

6    essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307,

7    319 (1979).  See also Prantil v. California, 843 F.2d 314, 316 (9th Cir. 1988) (per curiam).  "Put

8    another way, the dispositive question under Jackson is 'whether the record evidence could

9    reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d

10   978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318).[5]  The court must review the entire

11   record when the sufficiency of the evidence is challenged in habeas proceedings.  Adamson v.

12   Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th

13   Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).  It is the province of the jury to "resolve conflicts

14   in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to

15   _____

16          [4] In the instant petition, petitioner argues that the state appellate court's factual
     determination that Officer Downs used a police siren, flashing lights, and an announcement to
17   alert petitioner to the presence of police officers is contrary to the evidence in the record and is,
     therefore, not entitled to "a presumption of correctness."  (Pet. at 9 (ground eight).)  Petitioner
18   contends that, to the contrary, the evidence demonstrated "the lights and siren were shut off prior
     to arrival."  (Id.)  In this regard, Officer Downs testified that he had his emergency lights on and
19   his siren activated as he approached petitioner's residence until "right around the corner from the
     shooting scene." (RT at 220-21.)  Officer Downs also testified that he shouted as loud as he
20   could to the occupant of the motor home that "this is the sheriff's office.  You inside come out
     now." (Id. at 231-32.)  Accordingly, the state appellate court's determination that petitioner was
21   aware of the presence of police officers because of Officer Downs use of the police siren,
     flashing lights, and an announcement of his presence, is supported by the record and is entitled to
22   deference pursuant to 28 U.S.C. § 2254 (d).  The fact that the siren was turned off "right around
     the corner" from petitioner's residence does not call into question the conclusion drawn by the
23   state appellate court.

24          [5] The Ninth Circuit Court of Appeals has declined to consider the question of whether
     the AEDPA requires an additional degree of deference to state courts' resolution of sufficiency of
25   the evidence claims.  See Bruce v. Terhune, 376 F.3d 950, 956 (9th Cir. 2004); Chein, 373 F.3d
     at 983.  Because petitioner's claim fails under the Jackson standard this court also need not
26   address whether the enactment of the AEDPA altered that test for purposes of federal habeas
     proceedings in which the sufficiency of the evidence to support a conviction is being challenged.

ultimate facts." <u>Jackson</u>, 443 U.S. at 319.  "The question is not whether we are personally convinced beyond a reasonable doubt.  It is whether rational jurors could reach the conclusion that these jurors reached." <u>Roehler v. Borg</u>, 945 F.2d 303, 306 (9th Cir. 1991).  The federal habeas court determines sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law.  <u>Jackson</u>, 443 U.S. at 324 n.16; <u>Chein</u>, 373 F.3d at 983.

The state court decision rejecting petitioner's insufficiency of the evidence argument is not contrary to or an unreasonable application of the federal standards set forth above and should not be set aside.  The legal standard applied by the state court was described as follows:

> In reviewing the sufficiency of the evidence supporting a conviction, we view the evidence in the light most favorable to the prosecution and determine if a rational trier of fact could have found the elements of the offense beyond a reasonable doubt. (citation omitted.)  Reversal on the basis of insufficient evidence is warranted only if it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." (citation omitted.)

(Opinion at 5-6.)  This standard is fully consistent with the federal standard set forth by the Supreme Court in <u>Jackson</u>.  The state court's analysis is also based on a reasonable determination of the facts of this case.   As described by the California Court of Appeal, although there was some evidence introduced at trial which could have supported a finding that petitioner was unable to see from the trailer at the time he fired the shotgun, or that he suffered from psychological and emotional problems which might have impacted his perception and judgment at the time of the shooting, there was also evidence from which a rational juror could conclude that petitioner was able to see outside the trailer window and aim at Officer Meilbeck, thereby acting with express malice.  Further, notwithstanding evidence that petitioner suffered from emotional problems and learning disabilities, there was evidence at trial demonstrating that petitioner acted with knowledge of the danger and in conscious disregard for human life when he

13

1  fired the shotgun, thereby supporting a finding of implied malice.  In light of the evidence

2  introduced at trial, petitioner's jury could have found the essential elements of second degree

3  murder beyond a reasonable doubt.  Accordingly, petitioner is not entitled to relief on this claim.

4        B.  Jury Instruction Error (Claims 2, 7, 8)

5        Petitioner raises several claims of jury instruction error.  After setting forth the

6  applicable legal principles, this court will analyze these claims in turn below.

7        1.  Legal Standards

8        In general, a challenge to jury instructions does not state a federal constitutional

9  claim.  See Middleton, 768 F.2d at 1085 (citing Engle, 456 U.S. at 119); Gutierrez v. Griggs, 695

10  F.2d 1195, 1197 (9th Cir. 1983).  In order to warrant federal habeas relief, a challenged jury

11  instructions "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but

12  must violate some due process right guaranteed by the fourteenth amendment."  Prantil, 843 F.2d

13  at 317 (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail on such a claim

14  petitioner must demonstrate "that an erroneous instruction 'so infected the entire trial that the

15  resulting conviction violates due process.'"  Prantil, 843 F.2d at 317 (quoting Darnell v. Swinney,

16  823 F.2d 299, 301 (9th Cir. 1987)).  See also Estelle, 502 U.S. at 72.  In making its

17  determination, this court must evaluate the challenged jury instructions "'in the context of the

18  overall charge to the jury as a component of the entire trial process.'"  Prantil, 843 F.2d at 817

19  (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)).  Where the challenge is to a

20  refusal or failure to give an instruction, the petitioner's burden is "especially heavy," because

21  "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement

22  of the law."  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).  See also Villafuerte v. Stewart, 111

23  F.3d 616, 624 (9th Cir. 1997).

24        2.  Failure to Instruct the Jury with a Modified CALJIC No. 8.35 (Claims 2, 8)

25        Petitioner claims that the trial court erred in failing to instruct the jury "that [his]

26  mental disability could be used to determine whether he should have reasonably known the

14

victim was a peace officer." (Pet. at 7 (ground two).) In support of this claim, petitioner directs the court's attention to trial testimony regarding his mental disabilities and emotional problems, as well as testimony that he appeared dazed and confused when he was arrested. (Id.) Petitioner also directs the court's attention to the following questions asked by the jury during deliberations: (1) "Was the defendant before trial examined and found to be mentally fit for trial?" (CT at 529); and (2) "What is the meaning of present ability under CALJIC 9.00; Assault - Defined." (Id. at 525-26.)[6]

The state appellate court fairly described the background to this claim as follows:

Defendant contends the trial court erred in refusing his proposed modification to CALJIC No. 8.35. That instruction reads:

"It is alleged in Count[s] [    ] that defendant[s] murdered a peace officer engaged in the performance of [his] [her] duties and that defendant[s] knew or should have known the deceased was a peace officer engaged in the performance of [his] [her] duties.

"If you find defendant[s] guilty of second degree murder, you must determine whether or not:
"1. The person murdered was a peace officer,

"2. [He] [She] was killed while engaged in the performance of [his] [her] duties, and

"3. The defendant[s] knew or reasonably should have known that the person killed was a peace officer engaged in the performance of [his] [her] duties.

"The People have the burden of proving the truth of this allegation. If you have a reasonable doubt that it is true, you must find it to be not true.

"For the purposes of these instructions, _____ is a peace officer.

"You will include a special finding on this allegation in your verdict, using a form that will be supplied for that purpose."

---

[6] The trial court responded to this question as follows: "The term 'present ability' does not have any special legal definition. The words are used in their normal every day meaning." (Id. at 526.)

Defendant proposed to insert between paragraph No. 3 and the concluding two paragraphs the following:

"In determining whether the defendant should have known that ___ [insert appropriate knowledge element, e.g., that the other person was a peace officer], you must determine whether a reasonable person in the defendant's position would have known this fact. [This means that you must consider the defendant's _____ [insert specific impairment, if any, presented by the evidence, e.g. physical or mental disability, intoxication, etc.), as well as any characteristics of the defendant which could have impaired [his] [her] awareness that _____ [insert fact which should have been known].]"

If you have a reasonable doubt whether a reasonable person in the defendant's position should have known that _____[insert knowledge element], you must give the defendant the benefit of that doubt and not find that [he] [she] should have known."

(Opinion at 10-12.)

The state appellate court concluded that petitioner's proposed modification to CALJIC No. 8.35 was not necessary because the jury at petitioner's trial was adequately instructed how to analyze evidence of petitioner's mental impairment with respect to the charge of murder.  The court reasoned as follows:

The jury was informed that, in order to find true the special circumstance of a peace officer victim, it must find, among other things, that "the defendant knew or reasonably should have known that the person killed was a peace officer engaged in the performance of his duties."  The court further instructed: "You have received evidence regarding a mental defect or mental disorder of the defendant at the time of the commission of the crime charged . . . .  You should consider this evidence solely for the purposes of determining whether the defendant actually formed the required specific intent, premeditated and deliberated or harbored malice aforethought, which is an element of the crime charged in Count I, first degree murder, or formed the specific mental state included in the definition of the crimes and/or any lesser included crime and/or *any special finding you're instructed to make.*"  (Italics added.)  Hence, the jury was told to consider mental impairment in deciding whether defendant had the necessary mental state for the special circumstance of a peace officer victim, i.e., knowledge that the victim was a peace officer

/////

1    engaged in the performance of his duties.  No further clarification
2    was necessary.

3    (Id. at 13-14.)

4        After a review of the record, this court concludes that the state appellate court's

5    decision in this regard is not contrary to or an unreasonable application of federal law.  As

6    explained by the state appellate court, the jury was instructed to consider petitioner's mental

7    disabilities and emotional state in determining whether he knew or reasonably should have

8    known the victim was a peace officer.  An additional instruction to that effect would have been

9    cumulative and unnecessary.  Petitioner has failed to carry his "heavy" burden of showing that

10   the trial court's refusal to modify the standard instruction as defense counsel proposed rendered

11   his trial fundamentally unfair.  See Henderson, 431 U.S. at 155.  Accordingly, he is not entitled

12   to relief on this claim.

13       3.  Failure to Give Appropriate Jury Instructions

14       Petitioner argues throughout his petition that the trial court erred in failing to give

15   certain jury instructions.  Specifically, petitioner claims that the trial court "failed to sua sponte

16   give instruction on voluntary manslaughter (CALJIC 8.40, 8.42, and 8.43), failed to modify

17   CALJIC 8.11 and modified CALJIC 8.50."  (Pet., Ex. 1 at 70, 71-73.)  Petitioner also argues that

18   the trial court erred in failing to give a sua sponte jury instruction "on the standard of a

19   'reasonable person.'" (Pet., Ex. 1 at 80.)  Although petitioner cites several pages of the trial

20   record and summarizes the evidence related to his behavior at the time he was arrested, he does

21   not clearly explain the nature of the jury instruction modifications that he claims should have

22   been made by the trial court or why they were necessary.  He has also failed to demonstrate that

23   the jury instructions given at his trial rendered the proceedings fundamentally unfair.  It is well

24   settled that "conclusory allegations which are not supported by a statement of specific facts do

25   not warrant habeas relief."  James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994).  Petitioner's claims in

26   this regard do not meet the specificity requirement and should be denied on that basis.

17

1    Even considered on the merits, petitioner's general claims of jury instruction error

2 should be rejected.  After a review of those portions of the state court record cited by petitioner, it

3 appears that petitioner's trial counsel was attempting to have the jury instructed that it must find

4 that petitioner's actions in shooting Deputy Meilbeck were "deliberately formed with the actual

5 subjective knowledge of the danger to or the conscious disregard of human life."  (RT, Vol. IV

6 (Trial) at 798-99; RT, Vol. V (Trial) at 817-18.)  Petitioner's counsel was also attempting to have

7 the jury instructed to the effect that "psychiatric testimony as to specific intent and basically the

8 mental condition of the defendant can negate the specific intents required in this case and the

9 mental states required in this case."  (RT, Vol. V (Trial) at 816.)  The prosecutor argued that

10 these principles were already addressed in other jury instructions and that the instructions

11 requested by petitioner's counsel would give undue weight to the trial testimony of the defense

12 psychiatric witness.  (Id. at 817-18.)  After hearing argument and taking the matter under

13 submission, the trial court concluded that the additional language requested by petitioner "would

14 tend to confuse and not clarify" and that the language of the unmodified jury instruction (No.

15 8.11) "is clear and certain enough to give the jurors the guidance that they require."  (Id. at 815.)[7]

16    Reviewing the record and the jury instructions as a whole, the court concludes that

17 the trial court's failure to tailor the jury instructions as requested by petitioner did not render his

18 trial fundamentally unfair.  Petitioner's jury was adequately instructed on the mental state

19 required for a finding that petitioner harbored implied malice when he fired his shotgun in the

20 direction of Deputy Meilbeck.  As discussed above, the jury was adequately and appropriately

21 instructed on how to apply evidence of petitioner's mental and emotional disabilities to the

22 charges against him.  Further, in light of petitioner's defense that he was only guilty of

23 involuntary manslaughter, the trial court did not err in failing to sua sponte give jury instructions

24

25    [7] Petitioner's jury was instructed with CALJIC No. 8.11, which states that malice is
     implied when "the act was deliberately performed with knowledge of the danger to, and with
26 conscious disregard for, human life."  (CT at 581.)

1  on conflicting defenses or defenses not supported by the evidence, such as "heat of passion" or

2  "voluntary manslaughter."  For these reasons, petitioner is not entitled to relief on the above-

3  described claims of jury instruction error.

4      4.  <u>Failure to Give a Cautionary Instruction Regarding "Prison/Jail Garb, Handcuffs and</u>

5  <u>Shackles</u>

6      Petitioner's next claim is concerned with the possibility that the jurors saw

7  newspaper articles depicting petitioner in handcuffs and/or prison clothing and the fact that

8  petitioner's brother allegedly testified at trial in handcuffs and wearing prison clothing.

9  Petitioner argues that the trial court erred in failing to <u>sua sponte</u> give a jury instruction advising

10  the jury that "restraints have no bearing."  (Pet., Ex. 1 at 74.)

11      Petitioner has not cited to any relevant portion of the record in support of this

12  claim.  Indeed, the record does not reflect whether, in fact, petitioner and/or his brother were

13  shackled or the extent to which any shackles were visible to the jury.  Petitioner does cite to

14  several pages in the Clerk's Transcript on Appeal which contain newspaper photographs

15  depicting petitioner leaving the courthouse after pre-trial proceedings in shackles and prison

16  clothing and close-up photographs of petitioner's arrest.  (CT at 290, 301, 302).  However,

17  petitioner has presented no pictures of either himself or his brother in the courtroom during the

18  trial and there is no other evidence with respect to petitioner's attire or that of his brother when

19  they appeared before the jury.  Accordingly, there is no evidence suggesting that the trial court

20  was confronted with a situation which demanded the giving of a <u>sua</u> <u>sponte</u> jury instruction.

21  Petitioner's unsupported claim in this regard does not warrant habeas relief.  <u>See</u> <u>Jones</u>, 66 F.3d

22  at 204.

23      Even assuming that the jurors in petitioner's case saw newspaper articles

24  depicting petitioner leaving the courthouse following pre-trial proceedings in shackles and that

25  petitioner's brother appeared at trial both shackled and dressed in prison clothing, petitioner is

26  not entitled to relief on this claim.  First, it is important to recognize that petitioner is not

1   claiming that he was shackled during his trial.[8]  Rather, petitioner is claiming that the trial court

2   should have given a cautionary instruction to the jury regarding shackling and prison garb in part

3   because the jury may have been exposed to photographs appearing in the media prior to the trial

4   which depicted petitioner shackled and in jail clothing.  Petitioner cites no persuasive legal

5   authority nor presents any evidence in support of this claim.  Moreover, below the court will

6   address petitioner's claim that his change of venue motion should have been granted due to

7   prejudicial pre-trial publicity.  In rejecting that claim, this court has concluded that none of the

8   jurors in petitioner's case were influenced by any pre-trial publicity to which they were exposed.

9   That conclusion controls disposition of this claim as well.

10          Petitioner's claim that a cautionary instruction should have been given because his

11   brother appeared at trial in handcuffs and wearing prison clothing also lacks merit.  As noted,

12   petitioner has presented no legal argument nor made any factual showing in support of this claim.

13   Nonetheless, it has been held that because of the potential effect on credibility determinations,

14   the shackling of <u>defense</u> witnesses is to be measured under the same standards as the shackling of

15   the defendant.  <u>See</u> <u>Wilson v. McCarthy</u>, 770 F.2d 1482, 1485-86 (9th Cir. 1985).[9]  However, in

16   this case petitioner's brother appeared as a prosecution witness.  (RT, Vol. I at 32-69.)  Thus,

17   petitioner's claim with respect to his brother's appearance as a prosecution witness has no basis.

18          Finally, "[s]hackling, except in extreme forms, is susceptible to harmless error

19   analysis."  <u>Duckett v. Godinez</u>, 67 F.3d 734, 749 (9th Cir. 1995).  In a habeas corpus action, the

20

21          [8]  A defendant in a criminal case has a right to be free from physical restraint and this
     right is an essential component of a fair and impartial trial.  <u>See</u> <u>Illinois v. Allen</u>, 397 U.S. 337,
22   344 (1970); <u>Holbrook v. Flynn</u>, 475 U.S. 560, 568 (1986).  In order to justify shackling a
     defendant, "[f]irst the court must be persuaded by compelling circumstances that some measure
23   was needed to maintain the security of the courtroom. Second, the court must pursue less
     restrictive alternatives before imposing physical restraints." <u>Morgan v. Bunnell</u>, 24 F.3d 49, 51
24   (9th Cir. 1994)

25          [9]  In <u>Wilson</u> the court declined to impose a mandatory responsibility on the trial court to
     sua sponte give the jury a cautionary instruction regarding shackling where the defense fails to
26   request one.  770 F.2d at 1485.

question is whether the shackling "had substantial and injurious effect or influence in

determining the jury's verdict."  Id. (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).

The photographs of petitioner's arrest appeared in the print media long before the trial and,

although graphic, were not unduly inflammatory.  The case against petitioner was substantial to

the point of being overwhelming.  Despite the serious nature of his crime, the jury did not find

petitioner guilty of first degree murder, but of the lesser charge of second degree murder.  Under

these circumstances, even if the jury had viewed petitioner and/or his brother in shackles and

prison clothing, it would not have had a substantial and injurious effect or influence on the

verdict.   Accordingly, petitioner is not entitled to relief on this claim.

     C.  Change of Venue (claim 4)

       Petitioner claims that the trial court erred when it denied his motions for a change

of venue.  He argues that the media coverage of the crime was unduly prejudicial and that some

of the jurors harbored actual bias against him, as evidenced by their responses during voir dire.

       The state court record reflects that on August 13, 1998, petitioner filed a motion

for change of venue.  (CT at 273-344.)  Therein, petitioner contended that he could not receive a

fair and impartial trial in Yuba County because of the nature of the case and the extensive pretrial

publicity.  (Id. at 273-86.)  In support of the motion, petitioner's counsel included his own

declaration, in which he stated that he had participated in two other murder trials in Yuba County

which resulted in a change of venue, and that the press coverage from the local newspaper in

those cases was "similar in nature but less in extent than the coverage in the present case."  (Id. at

288.)  Counsel also noted that the Yuba County community had established a trust fund for the

benefit of Deputy Meilbeck's widow and young son, that a memorial service was held on the

one-year anniversary of the deputy's death, and that a monument was erected in honor of Deputy

Meilbeck and one other officer who had been killed in the line of duty.  (Id. at 284-85, 288.)

       Attached to the motion for change of venue were twenty newspaper articles from

the Appeal Democrat, the major local newspaper in Yuba County; four newspaper articles from

the <u>Sacramento Bee</u>; two editorial columns from the <u>Sacramento Bee</u>; one published letter to the editor of the <u>Sacramento Bee</u>; two articles appearing in a local newspaper, <u>The Times of Yuba-Sutter</u>; and one article from the <u>Business Journal</u>.  (<u>Id.</u> at 290-344.)  Most of the articles were published between April 2, 1997 and approximately May 8, 1997.[10]  (<u>Id.</u> at 290-331.)  The articles contained several pictures, including one graphic picture of petitioner in a choke-hold at the time of his arrest and several pictures of petitioner in prison clothing.  (<u>Id.</u> at 290-96.)  The gist of the articles was that petitioner shot his brother in the leg and was subsequently arrested for shooting Deputy Meilbeck from the trailer.  (<u>Id.</u>)  A local resident was quoted as saying that the "whole community knows about this and is hurting for the family."  (<u>Id.</u> at 299.)  The articles also reported that petitioner had a history of family feuding, drug usage, emotional problems, and drug and weapons convictions.  (<u>Id.</u> at 290-98.)  It was noted in several articles that prosecutors were initially seeking the death penalty against petitioner.  (<u>Id.</u> at 304, 315, 321.)

Some of the news articles included details about Officer Meilbeck and his family and the community's efforts to assist the victim's family.  (<u>Id.</u> at 290-331.)  One of the articles included an interview with petitioner's brother and was entitled, "Victim doesn't think his brother did it."  (<u>Id.</u> at 305.)  Another article was published in the <u>Appeal-Democrat</u> after petitioner's preliminary hearing was held.  (<u>Id.</u> at 333.)  That article noted the charges on which petitioner was held to answer and stated that several additional charges had been dismissed due to insufficient evidence.  The article also quoted the district attorney stating that petitioner "killed a deputy knowing that he was a deputy."  (<u>Id.</u>)  It was reported in the local Appeal-Democrat that petitioner had previously faced charges of "unlawful sexual intercourse, oral copulation and lewd acts against a 13-year-old girl," but that the charges were dismissed.  (<u>Id.</u> at 298.)  A news article and a Sacramento Bee columnist reported that petitioner's parents had obtained a restraining order against him in the past because of his threats to kill them and burn down their house.  (<u>Id.</u>

---

[10]  Jury selection in petitioner's trial did not commence until October 14, 1998.  (CT at 424.)

at 304, 311.)  The column reported that petitioner had been accused of raping a 13-year old

relative but that the case was dismissed for lack of evidence.  (Id. at 312.)  An article published in

the local Appeal-Democrat on April 2, 1998, reported on a memorial service held at the Yuba

County courthouse on the first anniversary of Deputy Meilbeck's death.  (Id. at 336.)

Several more news articles regarding the case were published between January 7,

1998, and approximately July 14, 1998, when petitioner's competency hearing was held.  (Id. at

334-42.)  Those articles summarized some of the testimony at the hearing and reported on the

trial court's finding that petitioner was competent to stand trial.  (Id. at 338-42.)  One article

reported that petitioner contended he was innocent and that the person responsible for the

shooting had escaped without being noticed by the police officers at the scene.  (Id. at 339.)

Also attached to the motion for change of venue was a directive from the Yuba County Sheriff's

Department to its deputies authorizing them to wear Deputy Meilbeck's badge number on their

lapel for a year following the officer's death.  (Id. at 344.)

After hearing arguments on petitioner's motion, the trial court declined to change

the trial venue, ruling as follows:

> THE COURT: . . . From reading both of your moving papers and
> your response, obviously both sides agree that the burden is on the
> defendant to prove a reasonable likelihood that a fair, impartial jury
> cannot be had in the County of Yuba.
>
> The law is quite clear that burden means prove by something less
> than more probable than not, but proof by something more than a
> mere possibility.
>
> Cases talk about five factors the Court must look at and weigh in
> deciding this issue: The nature and gravity of the offense; the size
> of the community; the status of the defendant; the popularity and
> prominence of the victim and the nature and extent of the publicity.
>
> Both of you very adequately addressed those areas.  The Court's
> review of the media coverage:  The Court finds that the media
> coverage has not been excessive, nor has it been inflammatory.

/////

/////

Even assuming that there's coverage of this hearing, the total articles in the past 15 months totals something less than 20 in the major newspaper circulated in this county.  The Sacramento paper has given it some minimal coverage.

There's no doubt – there's no quarrel Yuba County is a small community, and that's a factor that can favor a change in venue. This Court's experience from having been involved in cases which have received great notoriety in this community is that a large portion of the persons summoned for jury duty never read anything about the case, know any of the persons involved and don't know any of the facts of the case.

Mr. Peterson is not someone who is well known in the community. There's nothing to suggest he has a reputation in the community that would make selecting a jury from this county population reasonably unlikely.

The victim is not someone who was well known in the community. He did not live here and had only been with the Sheriff's Office a short period of time.  The fact he was a police officer does give him a certain prominence in the community; but beyond the fact he was a police officer, there's nothing to suggest the community viewed him differently than anyone else who's a victim of crime.

The fact he was a police officer does not change regardless of the jurisdiction in which this case is tried; and this Court cannot believe that from one community to another there's great importance placed on our police officer versus someone else.  Any homicide is a great offense.  The sensationalism that's inherent in all homicides, all capital cases will not in and of itself necessitate a change of venue.

The facts of this case could not in my mind take this particular crime out of the meaning of crimes of its nature.  If during jury selection we're unable to seat a panel, the problem can still be dealt with.  The case can still be moved.  Mr. Peterson is not being jeopardized.  But based on the evidence before me at this point, the motion is denied.

(RT, Vol. II (Pretrial) at 322-24.)[11]

/////

---

[11]  Under California law, a court determining whether a motion for change of venue should be granted must examine "five factors:" the gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim.  See People v. Jennings, 53 Cal. 3d 334, 359-60 (1991).

After the jury had been selected, petitioner's trial counsel orally renewed the motion for change of venue and submitted three additional newspaper articles.  (CT at 445; RT, Vol. IV (Pretrial) at 843.)[12]  Counsel stated that "the vast majority" of prospective jurors had heard about the case and argued that further peremptory challenges of jurors who had knowledge of the case would still result in a jury that had been unduly influenced by media coverage.  (RT, Vol. IV (Pretrial) at 843-45.)  In this regard, counsel stated:

> So I am faced with a dilemma.  I can either exhaust my peremptory challenges and run the risk of, in my mind, a worse jury panel, based upon my observations of the remaining jury venire, without achieving any significant improvement in the jury panel as far as knowledge or lack of knowledge in this case, lack of influence by the media and the balance of the jurors.
>
> For that reason, I have not exhausted peremptory challenges.  I feel at this time the jury is presently, as it sits, the best we're going to get.  My problem is that the jury panel . . . is a panel that's been influenced and unduly influenced by the media, and it is a panel that is not reasonably likely to provide a fair jury trial to my client.

(Id. at 845-56.)

The trial court again denied the motion for change of venue, ruling as follows:

> As the Court noted when this motion was originally before the Court, the media coverage has not been sensational nor inflammatory nor are the three most recent articles.  The Court is particularly aware that most jurors express some knowledge, that knowledge being something they've read or heard 18 months ago.  Everyone that is currently seated that had that knowledge has testified under oath that they have no true recollection of any of the details they heard and/or read at that time.  The Court is of the mind that based on the testimony of the jurors during the voir dire process that this panel, in fact, can sit and fairly, unbiasedly render a verdict, that they have not formed an opinion and the motion for change of venue is denied.

(Id. at 847.)

/////

---

[12]  Those articles are not contained in the lodged state court record.

1          The Sixth Amendment "guarantees to the criminally accused a fair trial by a panel

2   of impartial, 'indifferent' jurors." Irvin v. Dowd, 366 U.S. 717, 722 (1961).  See also Green v.

3   White, 232 F.3d 671, 676 (9th Cir. 2000).  If prejudicial pretrial publicity makes it impossible to

4   obtain an impartial jury, then the trial judge must grant the defendant's motion for a change of

5   venue.  Ainsworth v. Calderon, 138 F.3d 787, 795 (9th Cir. 1998), as amended 152 F.3d 1223;

6   Gallego v. McDaniel, 124 F.3d 1065, 1070 (9th Cir. 1997); Harris v. Pulley, 885 F.2d 1354,

7   1361 (9th Cir. 1988).  However, jurors are not required to be totally ignorant of the facts and

8   issues involved in a case.  Irvin, 366 U.S. at 722; see also Murphy v. Florida, 421 U.S. 794, 800

9   (1975); United States v. Sherwood, 98 F.3d 402, 410 (9th Cir. 1996).  It is sufficient if the jurors

10  can lay aside their impressions or opinions and render a verdict based on the evidence presented

11  in court.  Holt v. United States, 218 U.S. 245 (1910);  United States v. Dischner, 974 F.2d 1502,

12  1525 (9th Cir. 1992) (the issue is whether jurors could impartially judge the defendant, not

13  whether they remembered the case), overruled on other grounds by United States v. Morales, 108

14  F.3d 1031, 1035 n.1 (9th Cir. 1997).

15         The Ninth Circuit Court of Appeals employs a two-pronged test in determining

16  whether a habeas petitioner's rights to due process and a fair and impartial jury have been

17  violated by excessive and unfair publicity.  Daniels v. Woodford, 428 F.3d 1181, 1211 (9th Cir.

18  2005); Gallego, 124 F.3d at 1070; Harris, 885 F.2d at 1361; Hart v. Stanger, 935 F.2d 1007, 1014

19  (9th Cir. 1991).  Specifically, a habeas petitioner must demonstrate either actual or presumed

20  prejudice.  Daniels, 428 F.3d at 1211; Turner v. Calderon, 281 F.3d 851, 865 (9th Cir. 2002);

21  Hart, 935 F.2d at 1014 (citing Murphy, 421 U.S. at 800).  To demonstrate actual prejudice, the

22  petitioner must show that "the jurors demonstrated actual partiality or hostility that could not be

23  laid aside."  Daniels, 428 F.3d 1211 (quoting Harris, 885 F.2d at 1363).  See also Irwin, 366

24  U.S. at 728 (actual prejudice found where eight of the twelve empaneled jurors had already

25  formed the opinion that the defendant was guilty, and 268 of the 430 potential jurors were

26  excused for cause because they indicated some degree of belief in the defendant's guilt).  Actual

26

prejudice may also be found where the degree of adverse pretrial publicity has created a community-wide sentiment against the defendant, such that the jurors' claims that they can be impartial should not be believed.  Patton v. Yount, 467 U.S. 1025, 1031 (1984); Irwin, 366 U.S. at 728.  Prejudice is to be presumed only in extreme circumstances where the record demonstrates the trial venue was saturated with prejudicial and inflammatory publicity about the crime.  Daniels, 428 F.3d at 1211; Ainsworth, 138 F.3d at 795 ("prejudice is rarely presumed because saturation defines conditions found only in extreme situations.");  Gallego, 124 F.3d at 1070; United States v. Croft, 124 F.3d 1109, 1115 (9th Cir. 1997); see also Rideau v. Louisiana, 373 U.S. 723 (1963) (prejudice presumed where the case involved the televising of an in-jail twenty minute interrogation of the defendant by the police in which the defendant confessed to the murder for which he was subsequently convicted); Estes v. Texas, 381 U.S. 532 (1965) (prejudice presumed where the press was allowed to sit within the bar of the court and to overrun it with television equipment); Sheppard v. Maxwell, 384 U.S. 333, 357, 362 (1966) (prejudice presumed where media accounts contained inflammatory, prejudicial information that was not admissible at trial).

Three factors should be considered in determining presumed prejudice: "(1) whether there was a 'barrage of inflammatory publicity immediately prior to trial, amounting to a huge . . . wave of public passion;' (2) whether the news accounts were primarily factual because such accounts tend to be less inflammatory than editorials or cartoons; and (3) whether the media accounts contained inflammatory or prejudicial material not admissible at trial."  Daniels, 428 F.3d at 1211 (quoting Ainsworth, 138 F.3d at 795).

Finally, the duty of a federal court reviewing such a claim in a habeas corpus proceeding is to "make an independent review of the record to determine whether there was such a degree of prejudice against the petitioner that a fair trial was impossible."  Harris, 885 F.2d at 1360 (quoting Bashor, 730 F.2d at 1234).  To this end, a "reviewing court must independently examine the news reports for volume, content and timing."  Harris, 885 F.2d at 1360.  See also

1   Daniels, 428 F.3d at 1210.  A court must also consider whether the jurors had such fixed

2   opinions they could not impartially judge the guilt of the defendant.  Patton, 467 U.S. at 1035.

3          Here, petitioner's claim as presented potentially implicates both prongs of a

4   change of venue claim.  Below, the undersigned will first address whether a presumption of

5   prejudice is justified based upon the record and then turn to the question of whether petitioner

6   has demonstrated actual prejudice stemming from the denial of his change of venue motions.

7          Instructive with respect to the issue of presumed prejudice is the recent decision in

8   Daniels v. Woodford.  In that case the Ninth Circuit concluded that the presumption of prejudice

9   was appropriate where the killing of two police officers "generated extensive and nearly

10  continuous publicity immediately after the shooting and again before Daniels's trial."  428 F.3d

11  at 1211.  In that case: (1) the petitioner was identified in newspaper accounts as the killer "from

12  the very beginning;" (2) three months before trial, news articles covered the local school board's

13  proposal to rename its football stadium in honor of one of the slain officers; (3) one month before

14  petitioner's trial, on the anniversary of the killings, a statue commemorating fallen police

15  officers, including the petitioner's victims, was unveiled across the street from the courthouse

16  where the petitioner was tried; (4) the public's response to the publicity of the killings amounted

17  to a "'huge' wave of public passion," where citizens "deluged" police stations with calls offering

18  help and money; (5) local newspapers printed "numerous" letters from readers and editorials

19  calling for Daniels' execution; (6) approximately three thousand people attended the officers'

20  funerals; (7) eighty-seven percent of the jury pool recognized the case from media coverage and

21  two-thirds recalled specific facts about the petitioner, including his name; (8) news articles

22  adopted the prosecution's theory of the case; and (9) the press publicized the petitioner's past

23  criminal offenses, including a previous arrest for shooting at a police officer.  Id. at 1211-12.  In

24  light of such a record, the court found that the state trial court's denial of Daniels' motion for

25  change of venue violated his right to a fair trial before an impartial jury.  Id. at 1212.

26  /////

1      Because petitioner's case and that presented to the court in Daniels both involve

2  prosecutions for the murder of law enforcement officers they share some similarities.

3  Nonetheless, with respect to the nature and extent of the pretrial publicity there are significant

4  differences between the cases that impact the analysis with respect to the presumption of

5  prejudice.  In Daniels the court described a "huge wave of public passion," where more than

6  3,000 people attended the memorial service for the slain officers, and a "deluge" of calls to

7  police stations from citizens offering help and money.  In the instant case, on the contrary,

8  approximately 200 people, "predominately law enforcement officers and their families," attended

9  Deputy Meilbeck's first memorial service and approximately 700 people, again "mostly law

10  enforcement officers" attended his second memorial service.  (CT at 309, 324.)  There is no

11  evidence in the state court record that any of petitioner's prospective jurors attended either of the

12  memorial services for Deputy Meilbeck.  There is also no evidence that local citizens deluged

13  police stations with calls offering assistance.  In this case, as in Daniels, the local community

14  reacted to the death of the police officer(s) by holding funeral services and creating a memorial to

15  the victims.  However, in Daniels the memorial was located across the street from the

16  courthouse.  That was not the case here.  In Daniels, the press accounts included both editorials

17  and letters to the editor calling for Daniel's execution.  428 F.3d at 1212.  Here, there is no such

18  evidence.  Although in this case, as in Daniels, news accounts identified petitioner as the

19  perpetrator of the crime, there were also several articles reporting that petitioner's brother did not

20  believe petitioner was the person who fired the shots from the trailer and that petitioner himself

21  claimed he was not in the trailer at the time of the killings.  (Id. at 305-06, 327.)

22      It is true that the vast majority of potential jurors in petitioner's jury pool had read

23  something about the case in the newspapers or had seen television coverage of the case at the

24  time of the crime.  (See e.g. RT, Vol. II (Pretrial) at 450, 453; RT, Vol. III (Pretrial) at 618, 645,

25  655, 660, 679, 692, 703, 708, 710, RT, Vol. IV (Pretrial) at 749, 759, 765, 778, 785.)  However,

26  a large number of these jurors were the subject of peremptory challenges and almost all of them

indicated that they could not remember any details about the news coverage.  (See e.g., RT, Vol. III (Pretrial) at 656, 660, 692-93, 703, 711-12, 715, 723; RT, Vol. IV (Pretrial) at 750, 759-60, 779, 785, 791, 814, 834.[13]  In contract, in Daniels two-thirds of the potential jurors recalled specific facts regarding petitioner and some remembered him by name.  428 F.3d at 1211-12.  Although in both Daniels and the instant case, details about the defendants' prior criminal actions were reported in the media, the defendant in Daniels had a previous arrest for the same type of crime for which he was convicted. That was not the case here.  In summary, the situation confronted by the court with respect to pretrial publicity in Daniels was similar but far different in degree from the situation presented by this case.

Considering the three relevant factors identified by the court in Daniels and other Ninth Circuit decisions and having conducted an independent review of the news coverage reflected in the record, the court concludes that prejudice cannot be presumed in this case.  In this vein, the court accepts petitioner's assertion that there was substantial media coverage of his case.  However, as discussed above, the coverage did not amount to a "barrage of inflammatory publicity," "immediately prior to trial" nor did it result in a "huge . . . wave of public passion."  Daniels, 428 F. 3d at 1211.  Although there was one newspaper article about the case published each of the three days of jury selection, the vast majority of the media coverage took place at least three months before jury selection commenced.  (See CT 290-343.)  In fact, the coverage was by far at its most intense immediately after the crime occurred, which was more than a year before petitioner's trial commenced.[14]  Second, the news coverage of petitioner's case was primarily factual and did not include cartoons or editorials.  Finally, the media accounts did

---

[13]  A few jurors had specific recollection of details contained in the news reports and/or had already decided on petitioner's guilt based on those news accounts.  (See e.g., RT, Vol. III (Pretrial) at 645-46, 680, 730-31; RT, Vol. IV (Pretrial) at 822-84.)

[14]  It has long been recognized that the passage of time dissipates any prejudicial impact of media coverage.  Patton v. Yount, 467 U.S. 1025, 1034-35 (1984); Randolph v. California, 380 F.3d 1133, 1142 (9th Cir. 2004); Harris, 885 F.2d at 1362; Dischner, 974 F.2d at 1524.

1   contain some information about petitioner's past history (including his drug usage, emotional

2   problems, family feuding and convictions on drug and weapons charges) that was potentially

3   inadmissible at trial.  (Id.)   Nonetheless, some of those accounts portrayed petitioner as a

4   mentally unstable individual who, unfortunately, was not provided treatment before tragedy

5   struck.  (Ct at 311-12.)  The media also accurately reported that charges of aggravated mayhem

6   and a special circumstances allegation of lying in wait had been dismissed at the preliminary

7   hearing due to the insufficiency of the evidence.  (CT at 333.)  In any event, negative publicity is

8   not presumptively prejudicial.  See Harris, 885 F.2d at 1362; see also Nebraska Press Ass'n v.

9   Stuart, 427 U.S. 539, 554 (1976) ("pretrial publicity even pervasive, adverse publicity does not

10   inevitably lead to an unfair trial").  As noted by the Supreme Court, "[w]e must distinguish

11   between mere familiarity with petitioner or his past and an actual predisposition against him, just

12   as we have in the past distinguished largely factual publicity from that which is invidious or

13   inflammatory."  Murphy, 21 U.S. at 801 n.4.  Here, the news accounts of petitioner's case were

14   not inflammatory.

15          After independently reviewing the state court record and considering the relevant

16   factors, this court concludes that the record does not reflect a "general atmosphere in the

17   community or courtroom [which was] sufficiently inflammatory and prejudicial to deny

18   [petitioner his] right to a fair and impartial jury at trial."  See Harris, 885 F.2d at 1363 (quoting

19   Murphy, 421 U.S. at 802).  Accordingly, prejudice cannot be presumed in this case.

20          This court also finds that petitioner has failed to demonstrate actual prejudice on

21   the part of the jurors at his trial.  While there was extensive information about the case in the

22   local media, the coverage was not nearly as inflammatory as in those cases where actual

23   prejudice has been found.  See Irvin, 366 U.S. at 725-26 (involving a "barrage of newspaper

24   headlines, articles, cartoons and pictures . . . unleashed against . . . [the defendant] during the six

25   or seven months preceding his trial").  Further, although the potential jury pool learned from

26   media reports that petitioner had been arrested for the killing and that the shots came from his

31

1  trailer, the identity of the shooter was never seriously placed at issue at petitioner's trial.  Rather,

2  the thrust of petitioner's defense at trial was that he did not harbor the requisite intent required

3  for conviction on the charge of murder.  (RT, Vol. V (Trial) at 881-901.)

4          During voir dire, the perspective jurors were questioned individually regarding

5  their exposure to media accounts of the case.  Although some of the potential jurors had heard

6  about the case from newspaper reports or were acquainted with some of the witnesses and/or the

7  prosecutor, the jurors selected to sit on petitioner's jury denied having fixed opinions as to

8  petitioner's guilt but rather assured the court and the parties that they would decide the case

9  based solely upon the evidence presented at trial.  (RT, Vol. II (Pretrial) at 453-55, 467-69; RT,

10  Vol. III (Pretrial) at 524-28, 708-12, 736-37; RT, Vol. IV (Pretrial) at 792-93, 834.)[15]  Upon

11  independent review of the record, the court finds that none of the jurors' remarks during voir dire

12  indicate partiality, fixed opinion, or the inability to decide the case based solely on the evidence

13  presented at trial.  See Fetterly v. Paskett, 163 F.3d 1144, 1147-48 (9th Cir. 1998).

14          For the reasons set forth above, petitioner has failed to demonstrate that the media

15  coverage of his arrest and events leading up to his trial denied him the right to a fair trial in the

16  venue in which it was conducted.  Accordingly, petitioner is not entitled to relief as to this claim.

17      D.  Trial Court Errors (Claim 7)

18          Petitioner claims that the trial court committed numerous other errors resulting in

19  the violation of his federal constitutional rights.  The court will address these claims in turn

20  below.

21          1.  Failure to Make a New Competency Determination

22          Petitioner alleges that the trial court erred when it found him competent to stand

23  trial, thereby "rul[ing] against two doctors in favor of one." (Pet., Ex. 1 at 70, 73.)  In support of

24

25  _____

26  [15]  Even if the jurors' answers during voir dire indicated differently, however, the "existence of a [ ] preconceived notion as to the guilt or innocence of an accused, without more, is [not] sufficient to rebut the presumption of a prospective juror's impartiality." Irvin, 366 U.S. at 723.

this claim, petitioner directs the court's attention to a note sent by the jury during deliberations asking whether petitioner had been examined and found mentally fit for trial.  (Id. at 35; CT at 529.)[16]  Petitioner also directs the court's attention to several newspaper articles which reported that two out of three examining physicians opined that petitioner was unfit to stand trial.  (Pet. at 35; CT at 340.)  The gist of petitioner's claim appears to be that the evidence introduced at the competency hearing was insufficient to support the trial court's finding that petitioner was competent to stand trial, especially in light of testimony by two physicians that petitioner was not competent.  Petitioner does not cite to any portion of the state court record in support of this claim, nor does he explain in what way the trial judge's competency ruling was erroneous.  Petitioner's vague and unsupported claim in this regard does not warrant habeas relief.  See Jones, 66 F.3d at 204.

Moreover, petitioner's claim fails on the merits.  The state court record reflects that a court trial was held on the issue of petitioner's competence to stand trial.  (RT, Vols. I, II (Pretrial).)  Petitioner was represented by two attorneys.  (Id.)  Three expert witnesses and several lay witnesses testified at the trial.  (Id.)  The trial judge issued a written decision in which he stated that he had considered all of the evidence adduced at the trial and had determined that

---

[16]  In response to this note, the jury was re-instructed with CALJIC No. 1.03, which states:

> You must decide all questions of fact in this case from the evidence received in this trial and not from any other source.

> You must not make any independent investigation of the facts or the law or consider or discuss facts as to which there is no evidence.  This means, for example, that you must not on your own visit the scene, conduct experiments, or consult reference works or persons for additional information.

> You must not discuss this case with any other person except a fellow juror, and you must not discuss the case with a fellow juror until the case is submitted to you for your decision and only when all twelve jurors are present in the jury room.

(CT at 524, 552.)

1   petitioner was capable of understanding the proceedings against him, comprehended his own

2   status and condition in reference to the proceedings, and was able to assist his attorneys in

3   conducting his defense in a rational manner.  (CT at 261-65.)  The judge carefully analyzed the

4   evidence and articulated a detailed explanation of his decision.  (Id.)  The trial judge

5   acknowledged that two of the examining physicians opined that petitioner was not able to assist

6   his counsel in a rational manner.  However, the judge disagreed with those conclusions, based

7   both on the opinion of another examining physician and his own experience with criminal

8   defendants.  (Id.)

9          After a review of the relevant record, and evaluating the evidence in the light most

10  favorable to the prosecution, this court concludes that a rational trier of fact could have found

11  petitioner competent to stand trial.[17]  Although there was evidence that might have supported a

12  contrary conclusion, the state trial court did not act unreasonably in relying on the evidence

13  supporting a finding of competence.  This court also notes that the trial court's factual findings

14  regarding petitioner's competency, made after a full and fair hearing, are fairly supported by the

15  record and are presumed to be correct.  See 28 U.S.C. §2254(e)(1).

16         Cases cited by petitioner addressing the circumstances under which a trial court is

17  required to hold a competency hearing are not on point.  Petitioner received a competency

18  hearing.  To the extent petitioner is arguing that the trial court should have made a "new

19

20         [17]  The United States Supreme Court has held that the standard for competence to stand
    trial is whether the defendant has "sufficient present ability to consult with his lawyer with a
21  reasonable degree of rational understanding" and has "a rational as well as factual understanding
    of the proceedings against him."  Godinez v. Moran, 509 U.S. 389, 396 (1993) (quoting Dusky v.
22  United States, 362 U.S. 402 (1960).  See also Drope v. Missouri, 420 U.S. 162, 171 (1975).
    Under California law, "[a] defendant is mentally incompetent ... if ... the defendant is unable to
23  understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense
    in a rational manner."  Cal. Penal Code § 1367.   "On appeal a finding of competency to stand
24  trial 'cannot be disturbed if there is any substantial and credible evidence in the record to support
    the finding.'"  People v. Hightower, 41 Cal. App. 4th 1108, 1111 (1996) (quoting People v.
25  Campbell, 63 Cal. App. 3d 599, 608 (1976)).  Likewise, a state court's competency determination
    is entitled to a presumption of correctness on federal habeas review.  Demosthenes v. Baal, 495
26  U.S. 731, 735 (1990).

competency determination," (Pet., Ex. 1 at 73), or that the court should have held another

competency hearing, his argument is unpersuasive and should be rejected.  Of course, "[e]ven

when a defendant is competent at the commencement of his trial, a trial court must always be

alert to circumstances suggesting a change that would render the accused unable to meet the

standards of competence to stand trial."  Drope v. Missouri, 420 U.S. 162, 181 (1975).  In this

case, after the trial court made the determination that petitioner was competent to stand trial, no

evidence arose indicating that petitioner did not understand the trial proceedings, that he was

incapable of assisting his attorneys, or that the trial judge should have experienced doubt at any

point with respect to petitioner's competency to stand trial.  Accordingly, there was no reason for

the trial court to hold a new competency hearing or to revisit its initial ruling.  For all of these

reasons, petitioner is not entitled to relief on this claim.

>           2.  Failure to Excuse a Juror

>           Petitioner claims that the trial judge denied him the right to a fair trial when he

declined to dismiss a juror who revealed that he had been to the wedding of one of the

prosecution witnesses.  (Pet., Ex. 1 at 15.)

>           The state court record reflects that several days after trial had started, the trial

judge had the following exchange with a juror:

> > THE COURT:  Mr. _____, I asked you to come in today.  Deputy
> > Cross told me yesterday afternoon after the lunch hour you'd
> > indicated to him that having seen Officer Werner as a witness
> > brought back to your memory that you've met him at some point?
> >
> > JUROR NO. 9:  Yes, that's true.
> >
> > THE COURT:  Could you share with us?
> >
> > JUROR NO. 9:  Where I work I was – his wife and I have known
> > each other for years before she ever even met him.  And then she
> > moved from that job in Camptonville to a job in Nevada City.  And
> > we've been friends since then, since we worked for the same
> > organization.  And she – we got a wedding invitation and her
> > husband to be was Mr. Werner.  So I attended the wedding.  I don't

/////

1   really know him.  I met him there and I've talked to him at the
    ceremony.  I don't think I've talked to him since that time, but I
2   know her well.

3   THE COURT:  How long ago was the wedding?

4   JUROR NO. 9:  A year maybe.  Either a year or two.

5   THE COURT:  I take it until you saw him in court you didn't put
    his name with being the spouse?
6
    JUROR NO. 9:  No, because I knew her with a different last name
7   more than the Werner name.

8   (RT, Vol. III (Trial) at 324-25.)  Upon inquiry, this juror stated that his acquaintance with the

9   prosecution witness would not affect his ability to "fairly and in an unbiased, unprejudiced

10  fashion listen to all of the evidence, weigh it, judge everybody by the same standards."  (Id. at

11  325.)  Even though they were present during the juror's exchange with the trial judge, neither the

12  prosecutor nor the defense counsel elected to challenge this juror.  (Id.)  The court stated that,

13  "after listening to [the juror], finds that there's no reason he can't continue as a trial juror and he

14  will do so."  (Id. at 326.)

15       The trial court's failure to dismiss juror No. 9 did not render petitioner's trial

16  fundamentally unfair or otherwise violate his constitutional rights.  The trial judge investigated

17  the matter and carefully questioned the affected juror.  See Dyer v. Calderon, 151 F.3d 970, 974

18  (9th Cir. 1998) (en banc) (stating that "[a] court confronted with a colorable claim of juror bias

19  must undertake an investigation of the relevant facts and circumstances").  The court's finding

20  that the juror was unbiased is fully supported by the record.  See United States v. Ross, 886 F.2d

21  264, 267 (9th Cir. 1989) (holding that the district court did not err in failing to discharge a juror

22  or declare a mistrial, and noting that the trial judge is in the "best position" to make such

23  judgments).  "The central inquiry in determining whether a juror should be removed for cause is

24  whether that juror holds a particular belief or opinion that will prevent or substantially impair the

25  performance of his duties as a juror in accordance with his instructions and his oath."  United

26  States v. Padilla-Mendoza, 157 F.3d 730, 733 (9th Cir. 1998) (internal quotation marks and

1 citation omitted).  There is no evidence of that here.  The juror's contact with the prosecution

2 witness was minimal and there is no reason to suspect that this juror could not be fair.

3 Accordingly, petitioner is not entitled to relief on this claim.

4       3.  Limitation of "Psychiatric/Psychological Testimony"

5     Petitioner claims that the trial court denied him the right to present a "mental

6 defense" when it limited certain expert testimony related to his mental disorders.  (Pet., Ex. 1 at

7 71.)  The claim is stated, in full, as follows:

8     PSYCHIATRIC/PSYCHOLOGICAL TESTIMONY limited by the
    court (RT 660-663, 613-616) following prosecutors motion to limit
9     testimony (CT 435-442), the petitioners sole defense as presented
    by counsel.

10

11 (Id.)

12     The state court record reflects that the prosecutor filed a motion in limine to

13 restrict the testimony of defense mental health experts.  (CT at 435-42.)  Specifically, the

14 prosecution requested that a limitation be imposed on any expert testimony offered by the

15 defense regarding the issue of a mental disorder, disease or defect, and that the relevance of such

16 testimony to the point in time when petitioner shot his brother and/or Deputy Meilbeck be

17 determined.  (Id. at 441.)  Subsequently, the trial court held a hearing pursuant to California

18 Evidence Code §§ 402 and 403 to consider the prosecution's motion to limit the testimony of Dr.

19 Wicks, a defense expert witness.[18]  (RT, Vol. III (Trial) at 564.)  During that hearing, the trial

20 court reviewed videotapes of petitioner's police interrogation as well as a report of

21 neuropsychological testing conducted on petitioner.  (Id. at 565-67, 570-71.)  The court also

22 reviewed a videotape which consisted of out takes of petitioner's police interviews, compiled by

23 Dr. Wicks.  (Id. at 574.)  The defense later withdrew its request to introduce the compilation

24   ——————————

25   [18]  California Evidence Code § 402 provides that the court may hold a hearing outside the
presence of the jury to determine the admissibility of evidence.  California Evidence Code § 403
26 is concerned with the determination of foundational and other preliminary facts where relevancy,
personal knowledge, or authenticity is disputed.

videotape as evidence in petitioner's trial.  (RT, Vol. IV (Trial) at 613.)  Petitioner's counsel then

made the following statement:

> MR. ENOS (petitioner's attorney): Yes, Your Honor, one thing.
> just to avoid – just to make sure we're clear on something, during
> the opening statement I intend to advise the jury that Dr. Wicks
> will be called to testify, he's a licensed clinical psychologist, he did
> an evaluation and he formed an opinion as to Mr. Peterson's
> mental condition and we'll go through and recite the conditions
> that he found were pervasive developmental disorder, mild mental
> retardation, personality disorder including features of paranoid
> schitzoid and schitzotypic features.  I'm asking the Court if there
> will be any objection to that.  That is what he'll be testifying to.
>
> THE COURT: Mr. O'Rourke, the People have any objection to
> counsel --
>
> MR. O'ROURKE: None in regard to those conclusions as long as
> he doesn't go any further.
>
> MR. ENOS: I'm not.
>
> THE COURT: All that appears to be appropriate, Mr. Enos.

(Id. at 615-16.)

Immediately prior to Dr. Wicks' testimony, the court held a hearing on the

prosecutor's written request that Dr. Wicks be instructed regarding the limitations placed on his

testimony.  (RT, Vol. IV (Trial) at 660.)  All parties agreed that the issue was controlled by the

guidelines set forth in the decision in People v. Nunn, 50 Cal. App. 4th 1357 (1996).  In that case

it was held that the trial court properly excluded the testimony of a defense psychologist pursuant

to California Penal Code § 28, prohibiting evidence of mental disease to be admitted to show or

negate the capacity to form any mental state, and California Penal Code § 29, prohibiting an

expert witness from testifying whether a defendant did or did not have the requisite mental state

at the time of the offense.  Nunn, 50 Cal. App. 4th at 660-61.)  Here, the state trial court ruled as

follows:

> The record reflect [sic] that Dr. Wicks is present in the courtroom.
> The Court has, in fact, read People versus Nunn on numerous
> occasions.  The record should reflect that both counsel and the

1      Court have met and discussed this issue off and on since —
       probably the day before this trial actually convened.  People versus
2      Nunn, in fact, is the controlling authority to this court under the
       current state of the law.  It is proper for the Defense to present
3      evidence concerning defendant's mental condition and the effect
       that condition would have on his state of mind, but what Dr. Wicks
4      may not do and, in fact, he's instructed to not volunteer an opinion,
       instruct Mr. Enos (petitioner's attorney) not to ask him a question
5      calling for such an opinion, as to the following . . . Whether Mr.
       Peterson on April 1, 1997, acted willfully or intentionally, whether
6      he had knowledge of a danger to human life, whether he acted with
       conscious disregard for human life, whether he deliberated,
7      whether he premeditated, whether he knew or reasonably should
       have known that Brian Meilbeck was a peace officer and whether
8      or not he had the intent to kill. . . Dr. Wicks obviously is free to
       discuss Mr. Peterson's psychological background and to testify as
9      to any evaluation he made of the psychological setting of the
       encounters. . . that Dr. Wicks is also instructed to not reference any
10     specific exculpatory comments, if there are any, made by Mr.
       Peterson during the some four-plus hours of videotape made on the
11     evening of April 1 and early morning hours of April 2, 1997.

12   (CT at 661-63.)  Subsequently, Dr. Wicks testified for the defense at length concerning

13   petitioner's mental and emotional disabilities.  (RT, Vol. IV (Trial) at 664-778.)

14        Petitioner does not explain in what respect he contends the trial court's ruling was

15   in error, nor does he describe the testimony he intended to offer or explain how its exclusion

16   rendered his trial unfair.  Petitioner's vague and unsupported claim in this regard should be

17   rejected.  Jones v. Gomez, 66 F.3d at 204.  In addition, relief on the claim should be denied on

18   the merits.

19        An evidentiary ruling, based on state law, may not be set aside in a federal habeas

20   corpus proceeding unless it "render[ed] the state proceedings so fundamentally unfair as to

21   violate due process."  Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999).  See also Whelchel

22   v. Washington, 232 F.3d 1197, 1211 (9th Cir. 2000); Jeffries v. Blodgett, 5 F.3d 1180, 1192 (9th

23   Cir. 1993).  Of course, criminal defendants have a constitutional right, implicit in the Sixth

24   Amendment,  to present a defense; this right is "a fundamental element of due process of law."

25   Washington v. Texas, 388 U.S. 14, 19 (1967).  See also Crane v. Kentucky, 476 U.S. 683, 690

26   (1986) ("[T]he Constitution guarantees criminal defendants 'a meaningful opportunity to present

a complete defense.'") "However, that right is not unlimited." Greene v. Lambert, 288 F.3d 1081, 1090 (9th Cir. 2002).  Thus, a state court's exclusion of evidence under state law does not abridge a criminal defendant's right to present a defense unless it is "arbitrary or disproportionate" and "infringe[s] upon a weighty interest of the accused." United States v. Scheffer, 523 U.S. 303, 308 (1998).  See also Crane, 476 U.S. at 689-91 (discussing the tension between the discretion of state courts to exclude evidence at trial and the federal constitutional right to "present a complete defense"); Greene, 288 F.3d at 1090.

The trial court's modest limitation on the presentation of expert testimony related to petitioner's mental disabilities was in keeping with California law and did not render petitioner's trial fundamentally unfair or prevent him from presenting his defense.  The trial court's ruling on the in limine motion was certainly not "arbitrary or disproportionate." Scheffer, 523 U.S. at 308.  The record reflects that petitioner was allowed to present extensive evidence concerning his disabilities through the testimony of Dr. Wicks.  In his closing argument, petitioner's counsel argued his theory of defense based on petitioner's mental state.  (See, e.g., RT, Vol. V (Trial) at 887-894.)  Under these circumstances, petitioner's trial was not "conducted in such a manner as amounts to a disregard of fundamental fairness." Pike v. Dickson, 323 F.2d 856, 860 (9th Cir. 1963).  Accordingly, petitioner is not entitled to relief on this claim.

### 4. Failure to Hold a Marsden Hearing

Petitioner claims that the trial court improperly failed to hold a Marsden hearing on his request for new counsel.[19]  (Pet. at 9.)  In support of this claim, petitioner has filed his own affidavit in which he makes the following statement:

/////

/////

---

[19]  In People v. Marsden, 2 Cal. 3d 118 (1970), the California Supreme Court held that a trial court must permit a defendant seeking a substitution of counsel to specify the reasons for his request.

1   I swear that I requested a Marsden hearing from honorable James
    L. Curry and was not afforded the opportunity to state the reasons
2   for my request.  The honorable Judge James L. Curry denied my
    Marsden motion after saying that my defense counsel was doing a
3   fine job and it was too late to replace counsel.

4   (Pet., Ex. C-1 at 1.)  Petitioner informs this court that he and his defense counsel disagreed as to

5   trial tactics.  He also complains that his trial counsel refused to investigate or present a defense

6   based on the theory that an unknown stranger shot Deputy Meilbeck.  (Pet., Ex. 1 at 59.)

7   Respondent has not responded to this claim.

8           Petitioner states this claim in cursory fashion, without reference to anything in the

9   trial court record to support his bare allegation that he made a request for substitute counsel.

10  Petitioner's allegations do not meet the specificity requirement.  See Jones v. Gomez, 66 F.3d at

11  204.  Even if petitioner did make such a request, there is no evidence in the record of an

12  erroneous ruling or a failure to rule by the trial court.  In short, petitioner has provided no support

13  for his claim that a request for substitute counsel was improperly denied.  In a federal habeas

14  proceeding, the ultimate question on a claim concerning substitution of counsel is whether the

15  trial court acted in such a way as to actually violate the petitioner's "constitutional rights in that

16  the conflict between [the petitioner] and his attorney had become so great that it resulted in a

17  total lack of communication or other significant impediment that resulted in turn in an

18  attorney-client relationship that fell short of that required by the Sixth Amendment." Schell v.

19  Witek, 218 F.3d 1017, 1026 (9th Cir. 2000).  Petitioner has made no showing that the trial court

20  did so in his case.  Accordingly, petitioner is not entitled to relief on this claim.

21          E.  Incomplete State Court Record (claim 9)

22          Petitioner's next claim is stated, in full, as follows:

23  Motion requesting transcripts portions numerically missing, on
    issues raised herein, and other reports that were done that were not
24  in the record at all, items referred to but item not in transcript.
    Supporting facts change of venue motion has page missing (CT
25  357); other pages missing (CT 298, 304, 312), gunpowder test

26  /////

1        absent (CT 93-94) proposed jury instruction CALJIC 8.11 (CT
2        522) (RT 796-801, 817-818 missing, change of venue motion,
         recent article referred to absent (CT 445-446 (RT 843).

3    (Pet. at 9 (ground nine).)  Petitioner appears to be arguing that his federal constitutional rights

4    were violated because the state court record of the proceedings in his case is missing pages or

5    because some items referenced in the state court record (such as the result of a "gunpowder test,"

6    requested jury instructions, or newspaper articles) are not in fact contained in the record.

7            Petitioner's vague and unsupported claim in this regard does not warrant habeas

8    relief.  See Jones v. Gomez, 66 F.3d at 204.  Petitioner has failed to substantiate any claim of

9    federal constitutional error.  This court has noted that one volume of the Court Reporter's

10   Transcript on Appeal lodged by respondent is missing some pages that are not necessary to a

11   resolution of the pending petition.  See fn. 3, supra.  However, there is no evidence that any

12   omissions from the state court record rendered petitioner's pretrial or trial proceedings

13   fundamentally unfair.  See Mitchell v. Wyrick, 698 F.2d 940, 941-42 (8th Cir. 1983) (lack of a

14   complete record does not necessarily result in a denial of due process but rather prejudice must

15   be established); see also Ortiz Salas v. INS, 992 F.2d 105, 106 (7th Cir. 1993) (requiring

16   petitioner "to make the best feasible showing he can that a complete and accurate transcript

17   would have changed the outcome of the case"); White v. Florida Dep't of Corrections, 939 F.2d

18   912, 914 (11th Cir. 1991) (requiring showing of prejudice); Bransford v. Brown, 806 F.2d 83, 86

19   (6th Cir. 1986) (same).  Accordingly, petitioner is not entitled to relief on this claim.

20           F.  Actual Innocence (Claim 10)

21           In his next claim, petitioner argues that he is actually innocent of second degree

22   murder of Deputy Meilbeck and the assault with a firearm upon his brother.  (Pet. at 10.)  In

23   support of this claim, petitioner has filed the declaration of his brother, John Michael Peterson,

24   who now declares that petitioner did not shoot him.  (Pet., Ex. E.)  John Peterson also declares

25   that: (1) he did not tell Police Sergeant Virginia Black that petitioner shot him; (2) he told

26   Virginia Black that "someone with blonde hair" shot him; and (3) "the shot came from my little

1   brother's trailer, but it wasn't him (Phillip Anthony Peterson) who shot me (John Michael

2   Peterson)." (Id.)  Petitioner has filed two additional affidavits in connection with this claim.

3   Alfred Peterson, petitioner's father, declares that he was with John Peterson at the hospital for

4   three hours on April 1, 1997, and that John Peterson refused to speak to Sgt. Black during that

5   time.  (Pet., Ex. C-2.)  Cindy Vander Ploeg declares that she visited John Peterson in the hospital

6   on the night he was admitted and that from 7:30 p.m. until he went into surgery, Sgt. Black did

7   not come into petitioner's room to talk with him.  (Pet., Ex. C-3.)

8          The state court record reflects that Police Sergeant Virginia Black testified at

9   petitioner's trial that she had a conversation with John Michael Peterson at the hospital on April

10   1, 1997, the day he was shot.  (RT, Vol. III (Trial) at 555.)  According to Sergeant Black, this

11   conversation took place sometime between 6:00 p.m. and 8:00 p.m.  (Id. at 556-67.)  At that time

12   John Peterson told Sergeant Black that petitioner shot him in the leg.  (Id. at 555-56.)

13          John Michael Peterson testified at petitioner's trial that a "blonde haired person"

14   fired the shots from petitioner's trailer but that he couldn't specifically identify the person who

15   shot him.  (See RT, Vol. I (Trial) at 36, 42, 57.)[20]  John Peterson also testified that he couldn't

16   remember, and he wasn't sure, whether he talked to Sgt. Black at the hospital and/or told her that

17   petitioner had shot him.  (Id. at 42, 62.)  He testified that he did not recall seeing or talking to

18   Cynthia Van der Ploeg, Joyce Pruitt, or Cindy Widener at the hospital on the night he was shot.

19   (Id. at 66-68.)  Subsequently, at the request of the prosecutor and outside the presence of the jury,

20   the trial court found that "John Michael Peterson in the area of his testimony where he was

21   questioned in regards to any contact or discussions with Virginia Black on April 1, 1997, was in

22   fact dishonest."  (RT, Vol. III (Trial) at 552-54.)  Immediately prior to the defense opening

23   statement, and again outside the presence of the jury, the trial court made "a finding at this time

24   that John Michael Peterson was dishonest in his testimony in relation to Cynthia Vender Ploeg,

25

26          [20] From the newspaper articles filed in connection with the instant petition, it appears that
     petitioner has dark hair.  (See e.g., CT at 290, 301.)

43

1   Joyce Pruitt and Cindy Widener, that he did not see them, did not speak to them and did not

2   make certain statements to them while at Rideout Hospital on April 1 and/or early morning hours

3   of April 2, 1997." (RT, Vol. IV (Trial) at 614-15.)

4           In Herrera v. Collins, 506 U.S. 390 (1993), a majority of the United States

5   Supreme Court assumed without deciding that the execution of an innocent person would violate

6   the Constitution. A different majority of the Supreme Court explicitly so held. Compare 506

7   U.S. at 417 with 506 U.S. at 419 and 430-37. See also Jackson v. Calderon, 211 F.3d 1148,

8   1164-65 (9th Cir. 2000); Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997) (en banc).

9   Although the Supreme Court did not specify the standard applicable to this type of "innocence"

10  claim presented in a federal habeas corpus petition, it noted that the threshold would be

11  "extraordinarily high" and that the showing would have to be "truly persuasive." Herrera, 506

12  U.S. at 417. See also Carriger, 132 F.3d at 476. The Ninth Circuit has determined that in order

13  to be entitled to relief on such a claim a habeas petitioner must affirmatively prove that he is

14  probably innocent. Jackson v. Calderon, 211 F.3d at 1165; Carriger, 132 F.3d at 476-77.[21]

15          The affidavit of John Michael Peterson is the only evidence directly relevant to

16  petitioner's claim of actual innocence. The affidavits of petitioner's father and Cindy Vender

17  Ploeg do not have any direct bearing on petitioner's claim, but are apparently offered merely to

18  bolster the credibility of John Michael Peterson's affidavit. As discussed above, John Peterson

19  testified at trial that someone with blonde hair shot him. This testimony merely implied that

20  petitioner was not the shooter. However, in his subsequent affidavit John Peterson for the first

21

22  _____

        [21] The Ninth Circuit has also distinguished freestanding "actual innocence" claims, such
23  as that presented in Herrera, from those "actual innocence" claims brought pursuant to Schlup v.
    Delo, 513 U.S. 298 (1995). Carriger, 132 F.3d at 477; see also Cooper v. Woodford, 359 F.3d
24  1117, 1119 (9th Cir.), cert. denied 541 U.S. 1057 (2004). Although also referred to as "actual
    innocence" claims, in Schlup the Supreme Court addressed constitutional claims that are
25  otherwise procedurally barred, but may be heard in order to prevent a miscarriage of justice. The
    threshold for habeas claims brought under this "miscarriage of justice" gateway is lower because
26  the claims of constitutional error reduce the degree of deference accorded to the conviction. Id.
    In this case petitioner's claims are not procedurally barred and therefore Schlup is inapplicable
    here. Rather, petitioner is asserting a true freestanding actual innocence claim.

1   time states unequivocally that petitioner did not shoot him.  As such, John Peterson's affidavit

2   appears to be an effort to modify his trial testimony in order to be of more benefit to petitioner.

3            Courts have consistently found that a recantation of trial testimony by a witness is

4   inherently unreliable.  See Dobbert v. Wainwright, 468 U.S. 1231, 1233 (Brennan, J., dissenting

5   from denial of cert.) ("Recantation testimony is properly viewed with great suspicion"); Allen v.

6   Woodford, 395 F.3d 979, 994 (9th Cir.), cert. denied ___U.S.___, 126 S. Ct. 134 (2005);

7   Carriger, 132 F.3d at 483 (en banc) (Kozinski, J., dissenting) ("Recanting testimony has long

8   been disfavored as the basis for a claim of innocence.  Appellate courts, even on direct review,

9   look upon recantations with extreme suspicion"); In re Weber, 11 Cal. 3d 703, 724 (1974) ("The

10   offer of a witness, after the trial, to recant his sworn testimony is always looked upon with

11   suspicion.").

12            Moreover, discussing the use of affidavits to support a free-standing claim of

13   actual innocence, the Supreme Court in Herrera stated:

14            Petitioner's newly discovered evidence consists of affidavits.  In
          the new trial context, motions based solely upon affidavits are
15            disfavored because the affiants' statements are obtained without the
          benefit of cross-examination and an opportunity to make credibility
16            determinations. . . .  The affidavits filed in this habeas proceeding
          were given over eight years after petitioner's trial. No satisfactory
17            explanation has been given as to why the affiants waited until the
          11th hour . . .
18
          This is not to say that petitioner's affidavits are without probative
19            value.  Had this sort of testimony been offered at trial, it could
          have been weighed by the jury, along with the evidence offered by
20            the State and petitioner, in deliberating upon its verdict.  Since the
          statements in the affidavits contradict the evidence received at trial,
21            the jury would have had to decide important issues of credibility.
          But coming ten years after petitioner's trial, this showing of
22            innocence falls far short of that which would have to be made in
          order to trigger the sort of constitutional claim which we have
23            assumed, arguendo, to exist.

24   506 U.S. at 418-19.

25            Here, the affidavit of petitioner's brother, obtained without the benefit of cross-

26   examination and an opportunity to make a credibility determination, is inherently suspect and

45

does not provide sufficient support for petitioner's claim of actual innocence.  Indeed, the trial

court specifically found that John Michael Peterson's testimony was not credible with respect to

whether he told Sgt. Black that petitioner shot him.  Further, the affidavit now before the court

was drafted three years after petitioner's trial.  Petitioner has given no explanation for this delay.

In addition, the affidavit, which addresses the shooting of John Michael Peterson, is not

conclusive with respect to the murder of Deputy Meilbeck.  Although this affidavit offered by

petitioner may have some probative value, it is not convincing evidence either that John Michael

Peterson's trial testimony was false or that petitioner did not commit the murder of Deputy

Meilbeck.  Put another way, there is no evidence, based on the evidence presented to this court,

that a due process violation occurred in connection with petitioner's conviction.  The "newly

discovered evidence" relied upon by petitioner does not demonstrate convincingly that petitioner

is more likely than not factually innocent of the murder of which he was convicted, nor is it of

such probative value that it would probably have resulted in his acquittal if introduced at trial.

See Jackson, 211 F.3d at 1165.  Therefore, petitioner is not entitled to relief on this claim.

      G.   Vouching for a Witness/ Casting Doubt on a Witness (Claim 11)

      In his next claim, petitioner contends that the trial judge improperly vouched for

the credibility of prosecution witness Cindy Widener and improperly cast doubt on the credibility

of John Michael Peterson's testimony by making the following statement to the jury:

> after that night John Michael, after a period of time, returns home,
> and then he has a conversation with Cindy Widener.  Cindy will be
> the next witness.  And she will tell you what John Michael said
> really happened on the evening of April 1st.  You've already heard
> John Michael say nothing happened.  This is a friend of John
> Michael's and he's telling her what went on.  So that's what she'll
> share with you.

(Pet. at 10 (ground eleven).)

      However, review of the state court record reflects that the statement cited by

petitioner was actually made petitioner's own counsel in his opening statement and not by the

trial judge.  (RT, Vol. IV (Trial) at 617-18.)  The trial judge did find, as noted above, that John

1    Michael Peterson's testimony was not credible in certain respects.  However, the trial judge made

2    this finding outside the presence of the jury.  There is no evidence that the trial judge vouched for

3    or cast doubt on the credibility of any witness so as to impact the jury's consideration of the

4    testimony.  Accordingly, petitioner is not entitled to relief on this claim.

5         H.   Conflict of Interest (Claim 12)

6         Petitioner claims that the trial judge should have recused himself from ruling on

7    petitioner's competence to stand trial and on the defense motion for change of venue because of a

8    conflict of interest resulting from the fact that the judge and one of petitioner's attorneys were

9    former law partners.  (Pet. at 10; Pet., Ex. 1 at 14.)

10        The state court record reflects that attorney David Vasquez was appointed by the

11   trial court to assist petitioner's lead counsel.  (CT at 85, 249, 273, 368.)  Prior to the

12   commencement of the competency proceedings, the trial judge made the following disclosures:

13        In 1993 or four, David Vasquez and I were partners in a law firm.
          We no longer have any joint financial interests in that, any
14        accounts receivable associated with it.

15        He and I both still have an interest in litigation involving the 1986
          flood in Linda, in case (sic) that is up on appeal.  To my
16        knowledge, neither he nor I have any active role in it, other than
          hoping some day the appeal will be successfully determined.  And
17        we each own a five percent interest in Cal Northern School of Law.

18   (RT, Vol. I (Pretrial) at 3-4.)  Although invited to do so by the judge, neither the prosecutor nor

19   defense counsel objected to the judge's continued involvement in petitioner's trial based upon

20   the disclosed relationship.  (Id. at 4.)  The trial judge subsequently found that petitioner was

21   competent to stand trial, denied petitioner's motions for change of venue, ruled in favor of the

22   prosecution on a motion for discovery and declined to recuse a juror who had attended the

23   wedding of one of the prosecution witnesses.  (CT at 229; RT, Vol. III (Trial) at 3324-26.)

24   Petitioner argues that these rulings by the  trial court demonstrate prejudice resulting from the

25   judge's conflict of interest.

26   /////

"The Due Process Clause entitles a person to an impartial and disinterested tribunal."  Marshall v. Jerrico, Inc., 446 U.S. 238, 243 (1980).  In addition, "justice must satisfy the appearance of justice."  Offutt v. United States, 348 U.S. 11, 14 (1954).  As stated by the Supreme Court:

> A fair trial in a fair tribunal is a basic requirement of due process.
> Fairness of course requires an absence of actual bias in the trial of
> cases.  But our system of law has always endeavored to prevent
> even the probability of unfairness.  To this end no man can be a
> judge in his own case and no man is permitted to try cases where
> he has an interest in the outcome.

In re Murchison, 349 U.S. 133, 136 (1955).  See also Taylor v. Hayes, 418 U.S. 488, 501-04 (1974).

In attempting to make out such a claim of judicial bias, a petitioner must "overcome a presumption of honesty and integrity" on the part of decision-makers.  Withrow v. Larkin, 421 U.S. 35, 47 (1975).  A petitioner must also show that the judge "has prejudged, or reasonably appears to have prejudged, an issue."  Kennealy v. Lungren, 967 F.2d 329, 333 (9th Cir. 1992) (quoting Partington v. Gedan, 880 F.2d 116, 135 (9th Cir. 1989)).  There are two ways in which a petitioner may establish that he has been denied his constitutional right to a fair hearing before an impartial tribunal.  First, the proceedings and surrounding circumstances may demonstrate actual bias on the part of the adjudicator.  See Taylor, 418 U.S. at 501-04.  In other cases, the adjudicator's pecuniary or personal interest in the outcome of the proceedings may create an appearance of partiality that violates due process, even without any showing of actual bias.  Gibson v. Berryhill, 411 U.S. 564, 578 (1973); see also Exxon Corp. v. Heinze, 32 F.3d 1399, 1403 (9th Cir. 1994) ("[T]he Constitution is concerned not only with actual bias but also with 'the appearance of justice.'").

Petitioner has failed to demonstrate that the trial judge in his case acted improperly in failing to recuse himself under these circumstances.  There is no evidence of actual bias or that the judge had a personal interest in the outcome of the proceedings.  As explained

above, the trial judge's rulings with respect to petitioner's competency, the defense motions for change of venue and the potential bias of juror No. 9 were all based on the relevant law and the facts of this case.  There is no evidence that the judge's rulings in this regard were the result of, or effected by, his prior dealings with attorney Vasquez.  Of course, the mere fact that the trial court issued rulings that were not in petitioner's favor, standing alone, would not be sufficient to support a claim that the judge was actually biased against him.  See McCalden v. California Library Ass'n, 955 F.2d 1214, 1224 (9th Cir. 1990) ("Adverse rulings alone are not sufficient to require recusal, even if the number of such rulings is extraordinarily high"); Stivers v. Pierce, 71 F.3d 732, 741 (9th Cir. 1995).  There is no evidence that the trial judge harbored animosity towards petitioner's lawyer or would otherwise have wished to rule against petitioner because of his relationship with petitioner's second counsel.  This court also notes that the trial judge voluntarily disclosed his relationship with petitioner's second counsel, providing both parties with a basis for making a timely motion for recusal.  Neither party did so.  See First Interstate Bank of Arizona, N.A. v. Murphy, Weir & Butler, 210 F.3d 983, 989 n.8 (9th Cir. 2000) ("recusal issues must be raised at the earliest possible time after the facts are discovered").  Petitioner has cited no case, and this court has found none, holding that such a speculative potential for bias on the part of a judge, without more, violates the Due Process Clause. Accordingly, petitioner is not entitled to relief on his claim of judicial bias.

Petitioner also appears to be claiming that attorney Vasquez operated under a conflict of interest as a result of his relationship with the trial judge.  The Sixth Amendment right to counsel includes the right to counsel of undivided loyalty.  Wood v. Georgia, 450 U.S. 261, 271-72 (1981).  "In order to demonstrate a violation of his Sixth Amendment rights on the basis of an alleged conflict, a defendant must establish that an actual conflict of interest adversely affected his lawyer's performance."  Cuyler v. Sullivan, 446 U.S. 335, 350 (1980).  See also Mickens v. Taylor, 535 U.S. 162, 172 n.5 (2002) (an actual conflict "is not something separate and apart from adverse effect"); Bonin v. Calderon, 59 F.3d 815, 825 (9th Cir. 1995).  An

adverse effect in this context must be one that "significantly worsens counsel's representation of the client before the court or in negotiations with the government." United States v. Mett, 65 F.3d 1531, 1535 (9th Cir. 1995). Although a defendant alleging a conflict of interest "need not demonstrate prejudice," he must prove that "counsel actively represented conflicting interests." Cuyler, 446 U.S. at 349. Courts "generally presume that the lawyer is fully conscious of the overarching duty of complete loyalty to his or her client." Burger v. Kemp, 483 U.S. 776, 784 (1987).

Petitioner has failed to establish that his counsel was actively representing conflicting interests or that counsel's former business relationship with the judge had an adverse effect on his performance on behalf of petitioner. Petitioner has also failed to rebut the presumption that his trial counsel was acting according to his duty of loyalty. There is no conflict of interest under these circumstances and petitioner is not entitled to habeas relief.

I. Ineffective Assistance of Counsel (Claims 3, 5, 6)

Petitioner claims that he received ineffective assistance of trial and appellate counsel. After setting forth the applicable legal principles, the court will evaluate these claims in turn below.

1. Legal Standards

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984). To support such a claim a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. See Strickland, 466 U.S. at 687-88. After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally, competent assistance. Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003). Second, a petitioner must establish that he was

1  prejudiced by counsel's deficient performance.  Strickland, 466 U.S. at 693-94.  Prejudice is

2  found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

3  result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a

4  probability sufficient to undermine confidence in the outcome."  Id.  See also Williams, 529 U.S.

5  at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not

6  determine whether counsel's performance was deficient before examining the prejudice suffered

7  by the defendant as a result of the alleged deficiencies . . . .  If it is easier to dispose of an

8  ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

9  followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at

10  697).

11       In assessing an ineffective assistance of counsel claim "[t]here is a strong

12  presumption that counsel's performance falls within the 'wide range of professional assistance.'"

13  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting Strickland, 466 U.S. at 689).  There

14  is, in addition, a strong presumption that counsel "exercised acceptable professional judgment in

15  all significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing

16  Strickland, 466 U.S. at 689).  However, that deference "is predicated on counsel's performance

17  of sufficient investigation and preparation to make reasonably informed, reasonably sound

18  judgments."  Mayfield v. Woodford, 270 F.3d 915, 927 (9th Cir. 2001) (en banc)).

19       Defense counsel has a "duty to make reasonable investigations or to make a

20  reasonable decision that makes particular investigations unnecessary."  Strickland, 466 U.S. at

21  691.  "This includes a duty to . . . investigate and introduce into evidence records that

22  demonstrate factual innocence, or that raise sufficient doubt on that question to undermine

23  confidence in the verdict."  Bragg v. Galaza, 242 F.3d 1082, 1088 (9th Cir. 2001) (citing Hart v.

24  Gomez, 174 F.3d 1067, 1070 (9th Cir. 1999)).  Counsel must, "at a minimum, conduct a

25  reasonable investigation enabling him to make informed decisions about how best to represent

26  his client."  Hendricks v. Calderon, 70 F.3d 1032, 1036 (9th Cir. 1995) (quoting Sanders v.

Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).  On the other hand, where an attorney has

consciously decided not to conduct further investigation because of reasonable tactical

evaluations, his or her performance is not constitutionally deficient.  See Siripongs v. Calderon,

133 F.3d 732, 734 (9th Cir. 1998); see also Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.

1998).  "A decision not to investigate thus 'must be directly assessed for reasonableness in all the

circumstances.'"  Wiggins, 539 U.S. at 533 (quoting Strickland, 466 U.S. at 691).

### 2. Trial Counsel

Petitioner claims that his trial counsel committed numerous errors resulting in

petitioner receiving ineffective assistance.   It appears that petitioner's claims against his trial

counsel focus on the following areas: (1) counsel's failure to pursue a mental health defense,

such as "heat of passion" or "imperfect/unreasonable self-defense," including failing to proffer

jury instructions such as CALJIC Nos. 8.40, 8.42 and 8.43 with respect to such defenses, all of

which could have resulted in petitioner being convicted of the lesser crime of voluntary

manslaughter (Pet., Ex. 1 at 8-9; Memorandum of Points and Authorities in Support of Denial to

Return to Order to Show Cause ("Traverse") at 17); (2) counsel's failure to investigate and

pursue a defense based on the theory that someone else shot petitioner's brother and Officer

Meilbeck, including a failure to interview possible alibi witnesses (Pet., Ex. 1 at 42-43, 55-56a);

(3) counsel's failure to file motions;[22] (4) counsel's failure to properly "impeach witnesses" (id.

at 46-49, 54, 58) and to present an effective closing argument (id. at 49-52); (5) counsel's failure

/////

/////

/////

---

[22] Specifically, petitioner argues that his trial counsel was ineffective in failing to file motions: (a) to recuse the trial judge because of a conflict of interest on the grounds that the judge and one of petitioner's defense attorneys were former law partners (Pet., Ex. 1 at 43-44, 56a); (b) to challenge errors in the competency trial or request a rehearing with respect to the competency determination (id. at 44-45, 57); and (c) to challenge instances of juror bias (id. at 45-46, 57-58).

to make proper objections to the prosecution evidence;[23] (6) counsel's failure to effectively argue the motions for change of venue (id. at 53-54) ; (7) counsel's failure to present an adequate defense, motivated by his personal belief that petitioner was guilty (id. at 59); (8) counsel's actions in permitting the trial court to modify CALJIC 8.50 and failing to convince the trial court to modify CALJIC Nos. 8.11, 8.35 and 8.45, while permitting the trial court to give CALJIC No. 2.51; and (9) counsel's failure to present evidence of a "gun powder test" which was inconclusive as to whether petitioner fired the murder weapon.  (Pet., Ex. 1 at 54).[24]

As explained above, petitioner's claims of ineffective assistance of counsel were raised for the first time in an application for a writ of habeas corpus filed with the California Superior Court.  (Answer, Ex. G.)  For the reasons explained above, these claims will be reviewed de novo.

a. Failure to Pursue Mental Health Defense

Petitioner first claims that his trial counsel rendered ineffective assistance when he failed to pursue a mental health defense, such as "heat of passion" or "imperfect/unreasonable self-defense," which would have reduced the crime of conviction to voluntary manslaughter. (Traverse at 17.)  Similarly, petitioner claims that his trial counsel was ineffective in failing to structure his defense around the theory that petitioner committed voluntary manslaughter and/or to request appropriate jury instructions relevant to such a defense.

/////

_____

[23]  In this regard, petitioner argues that his trial counsel was ineffective in failing to object to (a) the fact that petitioner's brother testified as a prosecution witness while wearing prison clothing; (b) petitioner's photograph in the newspaper depicted him wearing prison clothing; and (c) unflattering newspaper photographs of petitioner's arrest ((Pet., Ex. 1 at 52-53).

[24]  Petitioner also argues that his counsel provided ineffective assistance when the trial judge gave or failed to give certain jury instructions, failed to recuse himself and denied petitioner's motions for change of venue.  (Traverse at 18-19.)  These allegations do not state a claim of ineffective assistance of trial counsel, but rather are aimed at errors allegedly made by the trial judge that are raised elsewhere in the petition.  Accordingly, the court will not analyze these allegations in addressing petitioner's claim of ineffective assistance of trial counsel.

1    The state court record reflects that petitioner's counsel chose to pursue the defense

2    theory that petitioner was guilty of only involuntary manslaughter because he fired the shots

3    without malice aforethought and without an intent to kill.  (RT, Vol. V (Trial) at 893-95, 898-

4    903.)  Counsel argued that petitioner's emotional condition at the time of the shootings was such

5    that he was unable to formulate intent, and simply acted out of "reflex" or "instinct."  (Id. at 900,

6    903.)  This was an eminently reasonable defense theory, especially considering evidence of

7    petitioner's behavior at the time of his arrest and the testimony of the defense medical expert

8    concerning petitioner's emotional disabilities which were exacerbated when he was placed under

9    stress.  (See RT, Vol. IV (Trial) at 664-778.)

10    Petitioner faults counsel for failing to present evidence in support of other

11    defenses, such as voluntary manslaughter and/or "heat of passion."  However, where it is

12    possible that the failure to present evidence was a "difficult but thoughtful tactical decision," a

13    reviewing court must presume that counsel's conduct was "within the range of competency."

14    Harris v. Pulley, 885 F.2d at 1368.  Indeed, "[c]ounsel's tactical decisions are 'virtually

15    unchallengeable.'"  Furman v. Wood, 190 F.3d 1002, 1006 (9th Cir. 1999) (citing Strickland, 466

16    U.S. at 687).  Here, defense counsel's tactical decision to pursue a theory of defense that

17    petitioner was guilty only of involuntary manslaughter is clearly within the range of competent

18    representation.  That being the case, petitioner's trial counsel did not provide ineffective

19    assistance in failing to investigate and/or request jury instructions relevant to other defenses, such

20    as voluntary manslaughter or "imperfect/unreasonable self-defense."

21    b.  Failure to Pursue Alibi Defense

22    Petitioner also faults his trial counsel for failing to investigate and pursue a

23    defense based on the theory that a blonde-haired stranger shot petitioner's brother and Officer

24    Meilbeck.  In support of this claim, petitioner cites, among other things: (1) the trial testimony of

25    petitioner's brother to the effect that a "blonde-haired" person might have fired the shots from

26    petitioner's trailer; (2) the post-trial affidavit of petitioner's brother wherein he states that

54

petitioner did not shoot him; (3) the fact that petitioner told his trial counsel that one of his neighbors had been burgled by a "blonde guy;" (4) the testimony of petitioner's mother at the preliminary hearing that two boys brought John Peterson's dog to the residence while she was "in a 911 call;" and (5) the affidavit of petitioner's father stating essentially that John Peterson did not speak to Ms. Van der Ploeg at the hospital.  (Pet., Ex. 1 at 42-43, 56; Ex. C-1 at 2.)

In advancing this argument petitioner ignores the fact that overwhelming evidence pointed to petitioner as the person who shot Deputy Meilbeck.  Counsel's decision to pursue a defense consistent with this reality was not unreasonable.  See Eggleston v. United States, 798 F.2d 374, 376 (9th Cir.1986) ("ineffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case").  The purported "evidence" cited by petitioner in support of his claim of a viable "alibi" that would have exonerated him is questionable at best and is clearly insufficient to establish that counsel was ineffective for failing to investigate the possibility of any such defense.

c. Failure to File Motions

Petitioner claims that his trial counsel was ineffective in failing to file a motion to recuse the trial judge because of a conflict of interest and in failing to challenge errors in the competency trial or to request a rehearing of the competency determination.  To demonstrate prejudice under Strickland from failure to file a motion, a defendant must show that: (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him.  Kimmelman, 477 U.S. at 373-75; Belmontes v. Brown, 414 F.3d 1094, 1121 (9th Cir. 2005), cert. granted ___U.S.___, 2006 WL 1131826 (May 1, 2006).  Petitioner has failed to make either showing.  As discussed above, this court has found that the trial judge did not have a conflict of interest and that the trial court's ruling with respect to petitioner's competence to stand trial was based on sufficient evidence.  An attorney's failure to make a meritless objection or motion does not constitute ineffective assistance of counsel.  Jones v.

1   Smith, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (citing Boag v. Raines, 769 F.2d 1341, 1344 (9th

2   Cir. 1985)).  See also Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) ("the failure to take a

3   futile action can never be deficient performance").  Accordingly, petitioner is not entitled to relief

4   on these claims.

5               d.  Failure to Challenge Jurors

6          Petitioner also claims that his trial counsel rendered ineffective assistance when

7   he failed to challenge certain potential jurors for bias.  (Pet., Ex. 1, at 45-46, 57-58.)  In support

8   of this claim,  petitioner has filed the declaration of his mother, Barbara Peterson, who declares

9   that on the first day of jury selection she overheard three potential jurors state that they would

10  find petitioner guilty.  (Pet., Ex. C.)  Mrs. Peterson asserts that one of these potential jurors was

11  later seated on petitioner's jury.  (Id.)  When Mrs. Peterson told petitioner's counsel about this

12  overheard conversation, counsel allegedly stated "there wasn't much he could do about it because

13  we have to take the good with the bad, and he thought it would be okay."  (Id.)  Petitioner

14  informs the court that his trial counsel requested the dismissal of this juror for cause, but his

15  request was denied.  (Pet., Ex. 1 at 45.)  Petitioner faults counsel for failing to "file a motion or

16  object to" the trial court's denial of this challenge for cause.  (Id.)  Petitioner also faults his trial

17  counsel for failing to ensure that juror No. 9 was excused from the jury after it was discovered

18  that the juror had attended the wedding of one of the prosecution witnesses.  (Id. at 45-46.)

19  Finally, petitioner argues that several jurors were biased against him because of "media

20  exposure."  (Id. at 58.)

21         A review of the state court record discloses that petitioner's counsel handled jury

22  voir dire and jury selection in a capable and professional manner.  Further, the trial judge's

23  colloquy with juror No. 9 established that this juror was fully capable of evaluating the evidence

24  fairly, notwithstanding his brief acquaintance with a prosecution witness.  Accordingly,

25  petitioner's trial counsel did not render ineffective assistance in failing to challenge juror No. 9

26  for cause.  Finally, even assuming that trial counsel was informed by petitioner's mother of the

56

1  overheard conversation between the three potential jurors, there is no evidence that any seated

2  juror was unable to decide petitioner's case fairly based solely upon the evidence presented at

3  trial.  In sum, petitioner has failed to demonstrate that his constitutional rights were violated

4  because of his trial counsel's handling of issues related to the selection of jurors or that petitioner

5  suffered any prejudice as a result of juror bias.  Accordingly, petitioner is not entitled to relief on

6  these claims.

7        e.  <u>Conduct of the Defense</u>

8        Petitioner faults his trial counsel in general for failing to present an adequate

9  defense.  Specifically, he argues that counsel failed to properly "impeach witnesses" or make an

10  effective closing argument on his behalf.  Petitioner points to various instances in the record

11  where the trial testimony of police officer witnesses was allegedly inconsistent with their

12  testimony at the preliminary hearing or with the testimony of other witnesses.  (Pet., Ex. 1 at 58.)

13  He also explains that he disagreed with his counsel regarding trial tactics, particularly counsel's

14  failure to present alibi witnesses.  (<u>Id.</u> at 55, 59.)  Petitioner contends that his counsel's failure to

15  pursue an appropriate defense was motivated by a belief that petitioner was guilty.  (<u>Id.</u> at 59.)

16        This court concludes, after a review of the record, that petitioner's counsel

17  presented the defense case in a competent and professional manner.  Counsel's closing argument

18  was capable and effective, as evidenced by the fact that the jury returned a verdict of second

19  degree, as opposed to first degree, murder.  The inconsistencies in the testimony of police

20  officers cited by petitioner pertained to relatively insignificant matters and did not call for

21  aggressive cross-examination.  Indeed, had counsel conducted cross-examination in the manner

22  apparently desired by petitioner, he may have done so to petitioner's detriment.  The defense

23  chosen and presented by petitioner's trial counsel was fully consistent with the evidence.  As

24  discussed above, petitioner disagreement with counsel's trial tactics may not support a claim of

25  ineffective assistance.  In addition, petitioner has failed to show that, but for but for counsel's

26  /////

1  alleged unprofessional errors, the result of the proceeding would have been different.  Strickland,

2  466 U.S. at 694.  Accordingly, he is not entitled to relief on this claim.

3                   f.  Failure to Object to Shackles and Prison Clothing

4           Petitioner challenges counsel's failure to object to: (a) the fact that petitioner's

5  brother testified as a prosecution witness while wearing prison clothing; (b) petitioner's

6  photograph which appeared in the newspaper depicted him wearing prison clothing; and (c)

7  unflattering newspaper photographs of petitioner's arrest.  For the reasons set forth above,

8  petitioner has failed to demonstrate prejudice with respect to these claims.

9                g.  Failure to Effectively Argue Motions for Change of Venue

10           Petitioner also claims that counsel failed to effectively argue the motions for

11  change of venue.  After a review of the record, this court concludes that counsel's arguments on

12  the motion were within the wide range of professionally competent assistance.  Further, as

13  discussed above, petitioner received a fair trial in the venue in which the trial was conducted.

14  Accordingly, relief as to this claim should be denied.

15                   h.  Jury Instruction Errors

16           Petitioner argues that his trial counsel rendered ineffective assistance by

17  permitting the trial court to modify CALJIC 8.50, failing to convince the trial court to modify

18  CALJIC Nos. 8.11, 8.35 and 8.45, and permitting the trial court to give CALJIC No. 2.51.[25]  The

19  gist of these arguments appears to once again be that defense counsel should have pursued a

20  defense based on the theory that petitioner committed the murders in the heat of passion or in

21  self-defense and that he did not understand that he was firing shots at a police officer.  As

22  discussed above, counsel's actions in this regard were the result of tactical decisions and were

23  /////

24   

25       [25]  CALJIC No. 8.50 defines the distinction between murder and manslaughter.  CALJIC
No. 8.11 defines the term "malice aforethought."  CALJIC No. 8.35 defines the crime of "second
degree murder of peace officer."  CALJIC No. 8.45 defines "involuntary manslaughter."

26  CALJIC No. 2.51 explains the importance to a trial of "motive."

1   reasonable under the circumstances.  Accordingly, petitioner is not entitled to relief on these

2   claims.

3                           i.  Failure to Present Evidence of Gunpowder Test

4               Petitioner also claims that his trial counsel rendered ineffective assistance when

5   he failed to introduce into evidence the results of a "gunpowder test" conducted to determine

6   whether petitioner's hands tested positive for the presence of gunpowder residue.  (Pet., Ex. 1 at

7   54).  Petitioner claims that the "gunpowder test" conducted by the prosecution was

8   "inconclusive" and that the gunpowder test conducted by the defense "showed no powder."  (Id.

9   & Ex. C-1.)  Reports reflecting the results of tests for gunpowder residue on petitioner's hands or

10  clothes, if any, have not been filed with the court.

11              Petitioner has failed to show that he was prejudiced by counsel's failure to

12  introduce into evidence the results of a "gunpowder test."  Even assuming arguendo that such a

13  test was performed and that the results were as described by petitioner, the court cannot say that

14  counsel's failure to introduce the results "render[ed] the result of the trial unreliable or the

15  proceeding fundamentally unfair."  Lockhart, 506 U.S. at 372.  Any such test would have been

16  irrelevant to petitioner's defense, which assumed that he fired the murder weapon, albeit without

17  the required criminal intent.  For this reason, counsel's failure to introduce the results of a

18  "gunpowder" test was not unreasonable under the circumstances.

19          3.  Appellate Counsel

20              Petitioner next claims that his appellate counsel rendered ineffective assistance

21  because of his failure to raise on appeal the following claims: "ineffective assistance of counsel,

22  change of venue, inconsistent testimony of prosecution witnesses, and information not in the

23  record."  (Pet. at 9.)  He also claims that counsel should have raised claims on appeal related to

24  "jury instructions, abuse of discretion of the court, and arguments raised herein."  (Pet., Ex. 1 at

25  60.)  Finally, petitioner claims that his appellate counsel was ineffective in failing to "rebut" the

26  conclusion of the California Court of Appeal that the police announced their presence at his

1    property by using a "light and siren" when, in fact, "the light and siren were shut off prior to

2    arrival." (Id.)  Petitioner provides evidence that he asked his appellate counsel to raise these

3    issues, but that counsel declined to do so because of his belief that the issues lacked merit. (Pet.,

4    Ex. A.)

5            The Strickland standards apply to appellate counsel as well as trial counsel.  Smith

6    v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).

7    However, an indigent defendant "does not have a constitutional right to compel appointed

8    counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

9    professional judgment, decides not to present those points." Jones v. Barnes, 463 U.S. 745, 751

10   (1983).  Counsel "must be allowed to decide what issues are to be pressed." Id.  Otherwise, the

11   ability of counsel to present the client's case in accord with counsel's professional evaluation

12   would be "seriously undermined." Id.  See also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th

13   Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is

14   not even particularly good appellate advocacy.")  There is, of course, no obligation to raise

15   meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88 (requiring a

16   showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing

17   to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to demonstrate prejudice in this

18   context, petitioner must demonstrate that, but for counsel's errors, he probably would have

19   prevailed on appeal.  Miller, 882 F.2d at 1434 n.9.

20           Petitioner's appellate counsel presumably reviewed the trial transcripts and

21   concluded that the issues which petitioner suggested should be raised on appeal lacked merit.  As

22   described above, this court has reached the same conclusion.  Appellate counsel's decision to

23   press only those claims with potentially more merit was "within the range of competence

24   demanded of attorneys in criminal cases." McMann v. Richardson, 397 U.S. 759, 771 (1970).

25           After a review of the record, this court concludes that the state court determination

26   with regard to petitioner's claim of ineffective assistance of trial and appellate counsel was not

1   contrary to, or an unreasonable application of federal law.  Accordingly, petitioner is not entitled

2   to relief on this claim.

3                                              CONCLUSION

4           Accordingly, for the reasons set forth above IT IS HEREBY RECOMMENDED

5   that petitioner's application for a writ of habeas corpus be denied.

6           These findings and recommendations are submitted to the United States District

7   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

8   days after being served with these findings and recommendations, any party may file written

9   objections with the court and serve a copy on all parties.  Such a document should be captioned

10  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

11  shall be served and filed within ten days after service of the objections.  The parties are advised

12  that failure to file objections within the specified time may waive the right to appeal the District

13  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

14  DATED: May 23, 2006.

16                                              Dale A. Drozd
                                                _____
17                                              DALE A. DROZD
                                                UNITED STATES MAGISTRATE JUDGE

18  DAD:8:peter1720.hc